505 P.2d 867

**SIERRA BLANCA SALES COMPANY, INC., a New Mexico corporation, Plaintiff-Appellant,**

v.

**NEWCO INDUSTRIES, INC., a New Mexico corporation, et al., Defendants-Appellees.**

**SIERRA BLANCA SALES COMPANY, INC., a New Mexico corporation, Plaintiff-Appellee,**

v.

**Eric N. CULVER, Defendant-Appellant.**

**Nos. 846, 898.**

Court of Appeals of New Mexico.

Nov. 3, 1972.

Certiorari Denied Dec. 15, 1972.

528

John R. Shaw, San Antonio, Tex., Albert J. Rivera, Alamogordo, Irwin S. Moise, Sutin, Thayer & Browne, Albuquerque, for Sierra Blanca Sales Co., Inc.

Joseph A. Sommer, Sommer, Lawler & Scheuer, Santa Fe, for Eric N. Culver and Tom Mosier.

Reginald J. Garcia, Simms & Garcia, Albuquerque, for Newco Industries and Ruidoso Racing Assn., Inc., known as Ruidoso Downs, Inc.

Bruce D. Black, George T. Harris, Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, for R. D. Hubbard.

## OPINION

WOOD, Chief Judge.

These consolidated appeals involve claims for breach of contract and fraud. All of the various defendants, except Culver, were granted summary judgments in cause 846. The claims against Culver were tried, and a jury verdict against Culver was entered, in cause 898. Sierra (Sierra Blanca Sales Company, Inc.) appeals from the summary judgments and Culver appeals from the judgment entered following the verdict. We divide the numerous issues in both causes into four general categories: A. breach of contract claims; B. fraud claims; C. newly discovered evidence; and D. damages.

Beginning in 1953, Eugene V. Hensley was associated, in various capacities, with what is referred to as the Ruidoso race track. Two of those capacities are involved in these suits; that of stockholder and that of a promoter of horse sales. A change in those capacities occurred after Hensley was convicted, in 1967, of felony offenses involving the federal income tax law.

Hensley and Culver negotiated for the sale of Hensley's stock in Ruidoso (Ruidoso Racing Association, Inc.). These negotiations culminated in a stock purchase agreement, entered in April, 1969. The sellers were Hensley and a former wife, Billie. The buyer was Culver " * * * acting * * * solely as an agent for a corporation to be organized and not individually * * *." In the same month, but subsequent to the stock purchase agreement, Newco (Newco Industries, Inc.) was incorporated.

In 1966, Myrl Hensley, another former wife of Hensley, apparently had the exclusive right to conduct certain horse sales held in conjunction with races at the track. By a contract dated in 1966, Myrl Hensley, for consideration, agreed to terminate this right and Ruidoso agreed to conduct the horse sales. Thereafter, either All American Livestock Sales Company or Ruidoso conducted the sales. There is evidence that Hensley was a major factor in the success of the sales.

The minutes of Ruidoso of July 7, 1968 (subsequent to Hensley's conviction), reflect that Ruidoso had inquired of the New Mexico Racing Commission [§ 60–6–2, N. M.S.A. 1953 (Repl.Vol. 9, pt. 1)], concerning the Commission's jurisdiction over horse sales by All American Livestock Sales Company, which is recited to be "an unincorporated division" of Ruidoso. After this inquiry, Ruidoso's understanding

was that the Commission would not have jurisdiction over " * * * a separate corporation not engaged or operating racing meets * * *." The minutes show the president of Ruidoso was authorized to employ counsel to form a corporation " * * * for the purpose of engaging in the sale of livestock in New Mexico or other states; the name of the corporation shall be the All-American Horse Sales Co. * * *"

There is no evidence that the separate corporation authorized by the minutes of July, 1968 was ever formed. Instead, Ruidoso engaged Hensley, as an individual, to perform services in connection with the horse sales.

In the negotiations between Hensley and Culver concerning the stock sale, All American Livestock Sales Company and Hensley's relation to the horse sales were discussed. There is substantial evidence that Hensley's willingness to sell the stock was tied to his obtaining an employment contract in connection with the horse sales. In March, 1969 (prior to the stock purchase agreement), Culver's written memo to Hensley indicates he was " * * * having a seperate [sic] contract drawn up on the non-competitive and employment contract for you. * * *"

A draft of an employment contract was sent to Hensley by Culver in March, 1969. This proposed contract contained an express reference to the stock purchase agreement. This contract would have been between Culver, in the same capacity as agent as in the stock purchase agreement, and Hensley, as an individual. This contract was not signed. There is evidence that because of Hensley's conviction, and because the New Mexico Racing Commission, by § 60–6–2, supra, is to approve contracts for the payment of money by race track licensees, it was tactically preferable for Hensley's name not to appear on the employment contract.

On April 1, 1969, Sierra was incorporated. The stockholders were Hensley and his then wife, Frances. On June 4, 1969,

an "employment agreement" was entered. One of the parties was Sierra; the contract was executed on behalf of Sierra by Hensley and Frances. The contract recites that it is entered into by " * * * ALL AMERICAN LIVESTOCK SALES COMPANY, hereinafter referred to as 'All American' * * *" but was signed by Culver. This contract was for the same term and same remuneration as the unsigned employment agreement, refers to services to be performed in connection with horse sales, contains a non-competition paragraph and a personal guarantee by Culver. Alleged lack of performance under this contract triggered this litigation.

A. *The contract claims.*

(1) *Culver's written contract.*

(a) Ambiguity.

In claiming that Culver breached the employment contract, Sierra offered oral evidence as to the intent of the parties in entering the contract. This evidence was admitted over Culver's objection. Culver would apply the rule that a written contract merges all prior and contemporaneous negotiations and evidence of oral agreements is inadmissible to vary or contradict the written contract. Armijo v. Foundation Reserve Insurance Company, 75 N.M. 592, 408 P.2d 750 (1965). This rule applies to contracts which are clear and unambiguous. *Armijo,* supra; Boylin v. United Western Minerals Company, 72 N. M. 242, 382 P.2d 717 (1963). That is not the situation here.

It is for the court to determine, as a matter of law, whether the contract is ambiguous. Lindbeck v. Bendziunas, 84 N.M. 21, 498 P.2d 1364 (Ct.App.1972); McDonald v. Journey, 81 N.M. 141, 464 P.2d 560 (Ct.App.1970). Culver's guarantee in the employment contract reads:

"Eric N. Culver personally guarantees that he will cause the terms of this agreement to be entered into between All American Livestock Sales Company and Ruidoso Racing Association, Inc., immediately upon assuming an executive posi-

tion with both All American Livestock Sales Company and Ruidoso Racing Association, Inc."

Does the quoted language mean that the two entities identified—All American and Ruidoso—were to enter an employment contract between themselves? If so, who was to be the employer and who the employee? Does it mean that each of the two entities were to enter a contract with Sierra, or were each to ratify Culver's contract? What is the entity referred to as All American? Looking to the entire contract (Lindbeck v. Bendziunas, supra), Sierra and Ruidoso are identifiable as corporations. All American is not so identified; the nature of that entity nowhere appears in the contract.

■ We hold the employment contract is ambiguous. The intent of the parties was, therefore, to be ascertained from the language and conduct of the parties and the surrounding circumstances. Ashley v. Fearn, 64 N.M. 51, 323 P.2d 1093 (1958). The trial court did not err in admitting oral evidence as to the intent of the parties.

(b) Mutual mistake of fact.

■ Culver contends no employment contract came into existence because of a mutual mistake of fact. This mutual mistake is asserted to be that the parties assumed that All American constituted a separate corporation. We do not reach the question of the status of a contract after it is established that there has been a mutual mistake of fact; this contention is answered on the basis that no such mutual mistake occurred. A mutual mistake exists where there has been a meeting of the minds of the parties and an agreement actually entered into, but the agreement in its written form does not express what was really intended by the parties. Morris v. Merchant, 77 N.M. 411, 423 P.2d 606 (1967); Cleveland v. Bateman, 21 N.M. 675, 158 P. 648, Ann.Cas.1918E, 1011 (1916); Smith v. Loos, 78 N.M. 339, 431 P.2d 72 (Ct.App.1967).

Here, the question of mutual mistake was one of Culver's defenses submitted to the jury for its determination. Its verdict in favor of Sierra necessarily found against Culver on this claim. The evidence is substantial that in referring to All American the parties agreed upon and intended the All American entity operated as an unincorporated division of Ruidoso and that was the All American referred to in the contract.

We add that the concept of a corporation having anything to do with the horse sales is nebulous, at best. An All American Livestock Sales Company, Inc. was incorporated in March, 1966, and Myrl Hensley was one of the incorporators. It apparently was in April, 1966 that Myrl Hensley, individually, entered the contract with Ruidoso by which she gave up her right to conduct the horse sales. We are referred to no evidence, and we have found none, indicating either that Myrl Hensley had transferred her right to conduct the horse sales to the All American corporation or that the All American corporation had any rights in connection with the horse sales at the race track. Further, as we have previously pointed out, there is no evidence that the corporation, authorized in Ruidoso's minutes of July, 1968, was ever formed.

(c) Unilateral mistake.

■ Culver contends that a representation was made on behalf of Sierra to the effect All American was a corporation, and that he relied on the representation. He asserts the result was a unilateral mistake on his part. He claims such a mistake entitled him to rescission and, thus, that the contract was unenforceable. He relies on Jones v. Friedman, 57 N.M. 361, 258 P.2d 1131 (1953). There is no basis for this claim and *Jones*, supra, does not support the argument. *Jones*, supra, refers to a misrepresentation of a material fact which is justifiably relied on by the party seeking rescission. There is substantial evidence that Culver did not rely on the al-

leged representation; rather, he independently checked on All American's legal status. In addition, no claim of unilateral mistake was raised in the trial court. It cannot be raised here for the first time. Tafoya v. Whitson, 83 N.M. 23, 487 P.2d 1093 (Ct.App.1971).

(d) Mistake as to identity of party.

There is substantial evidence that All American was no more than the alter ego of Ruidoso. Culver contends that since All American was not a corporation, he was mistaken as to one of the parties that he guaranteed would enter into the employment contract. On this basis he argues that no contract existed between himself and Sierra. We need not review the authorities relied on; they deal with mistakes as to the identity of the contracting parties. No such mistake exists here; Culver knew he was contracting with Sierra.

As to his asserted mistake as to the identity of a party he guaranteed would enter the contract, there is substantial evidence that no such mistake occurred; thus, we do not consider what effect, if any, such mistake would have on the Culver-Sierra contract. There being substantial evidence that no such mistake occurred, we cannot hold, as a matter of law, that a mistake did occur in fact.

(e) Misrepresentation of law.

Culver contends that the guarantee of employment was to be with All American as a corporation; that this guarantee was made in reliance on Sierra's representation as to the existence of the corporation; that this was a misrepresentation of law which prohibits enforcement of the contract against Culver. We doubt that the claimed misrepresentation could be classified as a mistake of law. The asserted misrepresentation as to All American's legal status appears to be one of fact, rather than law. See Points v. Wills, 44 N.M. 31, 97 P.2d 374 (1939). But the answer to this claim is that no such claimed misrepresentation was presented to the trial court and, therefore, will not be considered here. Tafoya v. Whitson, supra.

A related claim is that Culver's guarantee applied to two entities—All American and Ruidoso. If, as Sierra asserts, these two entities are actually only one entity and the guarantee became effective when Culver assumed an executive position with Ruidoso, Culver asserts a misrepresentation of law occurred because Sierra represented that the employment guarantee was to apply to All American and not to Ruidoso. Not only is there substantial evidence that the parties intended only one entity, which would foreclose our ruling on this issue as a matter of law, this claim was never presented to the trial court and, therefore, will not be considered here. Tafoya v. Whitson, supra.

(f) Condition precedent and legal impossibility.

Culver states: "The guarantee made by Culver was subject to an express condition precedent and it was therefore necessary as a condition to liability that the event occur which would trigger his obligation and any damages flowing from a breach of that obligation, namely, that he assume an executive position with All American Livestock Sales Company * * *."

Culver also states: "Not only did the condition precedent not occur, but so long as All American Livestock Sales Company was a fictitious name for Ruidoso Racing Association, Inc., as maintained by Sierra Blanca, it was legally impossible for Culver to perform the condition of having an agreement entered into between All American and Ruidoso."

We need not decide whether "the event" —the assumption by Culver of an executive position with both All American and Ruidoso—was a promise as opposed to a condition precedent. If the guarantee was a promise that the employment contract would be entered into by the entities named, it was not kept. If assumption of an executive position was a condition precedent to liability on Culver's part, the condition was fulfilled. The facts are un-

disputed that Culver assumed an executive position with Ruidoso. There is substantial evidence that All American was not a legal entity separate from Ruidoso but was no more than the alter ego of Ruidoso. The consequence is that Culver assumed an executive position with All American when he assumed his executive position with Ruidoso.

The predicate for the condition precedent and the legal impossibility claim then is that the guarantee required two separate legal entities. This predicate is one of the ambiguities in the guarantee which was resolved by evidence of the intent of the parties. The intent was a factual matter. This factual matter was submitted to the jury. The jury was instructed as to Culver's affirmative defense concerning " * * * a condition precedent to the personal guaranty * * * " of Culver. By its verdict, the jury rejected the claim of an unfulfilled condition precedent.

The jury result is supported by substantial evidence. That evidence is that the guarantee, which named both All American and Ruidoso, intended only one entity since All American and Ruidoso were one and the same. Thus, we hold that under the evidence the question of an unfulfilled condition precedent was properly resolved by the jury.

None of the contentions raised by Culver prevented enforcement of his written contract against him.

(2) *Culver's oral guarantee.*

Between the signing of the stock purchase agreement and the signing of the employment contract, there is evidence of conversations, in May, 1969, between Hensley and the individual defendants—Culver, Hubbard and Mosier—concerning the employment contract. Over Culver's objection, Hensley testified: "Mr. Culver had said at all times that we had talked about this side contract, which is the Sierra Blanca contract, that he would personally see that I got my money on the contract."

Culver objected to this testimony on the ground that it attempted to vary Culver's guarantee which was put in writing at a later date.

Even if the testimony as to Culver's oral guarantee was inadmissible on the breach of contract claim, the testimony was admissible on the claim of fraud. Rice v. First Nat. Bank in Albuquerque, 50 N.M. 99, 171 P.2d 318 (1946); see Bell v. Lammon, 51 N.M. 113, 179 P.2d 757 (1947). Thus, Culver's objection was properly overruled.

Here, he claims the testimony was inadmissible under the Statute of Frauds because the asserted oral guarantee could not be performed in one year. This argument necessarily assumes that the oral guarantee was a separate contractual obligation of Culver. Our answer is that the assumed oral contract is not supported by the record. The oral guarantee of Culver was pleaded as part of the claim of fraud. Further, the claim that Culver's oral guarantee could not be performed in one year was not raised in the trial court and will not be considered here. Tafoya v. Whitson, supra.

(3) *Hubbard and Mosier contract claims.*

This issue is directed to the summary judgment dismissing Sierra's breach of contract claim against Hubbard and Mosier.

There is testimony in the depositions considered at the summary judgment hearing that Hubbard and Mosier made certain oral representations to Hensley in connection with the employment contract, both before and after that contract was signed by Culver and Sierra. We do not understand from the pleadings, the briefs or the oral argument that it is claimed these representations, in themselves, amounted to a contract between Sierra and either Hubbard or Mosier. These representations will be discussed in connection with the fraud claims; we mention them here only for the purpose of identifying the breach of contract claim.

The breach of contract claim is based on the written contract between Sierra and Culver. Sierra pleaded that Culver was the agent for Hubbard and Mosier in signing the employment agreement. Both Hubbard and Mosier recognize the existence of this issue in their answer briefs. Although Hubbard does not argue this issue, he states flatly: "Summary judgment was granted Hubbard because the record was undisputed that Culver was not Hubbard's agent. * * *" Mosier refers to this theory at least twice in answering Sierra's brief-in-chief.

The oral argument of Sierra made reference to the alleged agency of Culver for Hubbard and Mosier.

We have detailed the references to an alleged breach of contract by Hubbard and Mosier, on the theory that Culver was their agent, because this issue is not stated as a point relied on by Sierra; nor is this issue developed or argued in Sierra's brief. See § 21–2–1(15), ¶¶ 11 and 14, N.M.S.A.1953 (Repl.Vol. 4). Therefore, any issue as to a breach of contract by Hubbard and Mosier, on the theory that Culver was their agent, is considered as abandoned. Novak v. Dow, 82 N.M. 30, 474 P.2d 712 (Ct.App.1970). Accordingly, the summary judgment on this breach of contract claim in favor of Hubbard and Mosier is affirmed.

(4) *Corporation contract claims.*

This issue requires identification of the corporate parties. Ruidoso was the corporation in which Hensley and Billie held stock. This was the stock sold to Culver as agent for a corporation to be organized. There is substantial evidence that the corporation to be organized was Newco. Sierra alleged, and the answer of Newco and Ruidoso admitted, that Ruidoso and Newco merged to form a new corporation known as Ruidoso Downs, Inc.

Sierra also alleged, and the answer of Ruidoso and Newco admitted, that: " * * * if the acts of Newco Industries, Inc. or Ruidoso Racing Association, Inc.,

severally or both, are found to be tortious or legally liable to the Plaintiff, they are the acts of Ruidoso Downs, Inc., the new corporation."

Subsequently, on motion of attorneys for the above identified corporate defendants, an order was entered substituting Fortuna Corporation as a party defendant "in the name and stead of" Ruidoso, Newco and Ruidoso Downs, Inc.

(a) Newco contract claim.

Deposition testimony and exhibits raise a factual question as to whether Culver was acting as the agent of Newco in signing the employment contract with Sierra. Newco does not contend otherwise. Instead, it argues that the employment contract between Culver and Sierra "fails abysmally as a legal contract." In support of this conclusion, Newco relies on ambiguities in the wording of the contract. Our answer is that the contract is admitted to exist and that ambiguities are to be resolved by extrinsic evidence as to the intent of the parties. See our previous discussion under Point A(1)(a) concerning ambiguities.

Ruidoso asserts that even if Culver were Newco's agent, there is nothing indicating that Culver was the authorized agent of Ruidoso. Even if this were true, it would be of no aid to Newco.

The argument as to an absence of a factual issue concerning Culver's agency for Ruidoso mistakes the appellate issue. Sierra pleaded that Culver was the agent of both Newco and Ruidoso and summary judgment was entered in favor of these two corporations on this issue. Sierra's appeal does not assert there is a factual issue as to Culver's agency for Ruidoso. See Novak v. Dow, supra. Sierra's agency claim on appeal is that the summary judgment in favor of Newco was erroneous. There is a factual issue as to Culver's agency for Newco in signing the employment agreement. No legal reason has been advanced which supports the summary judgment in favor of Newco. According-

ly, that summary judgment is reversed. This reversal, because of the admission in the pleadings and substitution of parties, also applies to Ruidoso Downs, Inc. and Fortuna Corporation.

(b) Ruidoso's liability for Newco.

Sierra contends any liability of Newco is the liability of Ruidoso as a matter of law. This contention is based on § 51–27–6(E), N.M.S.A.1953 (Repl.Vol. 8, pt. 1, Supp. 1971). We disagree.

Section 51–27–6(E), supra, is concerned with the merger or consolidation of corporations and states in part: "the surviving or new corporation · shall thenceforth be responsible and liable for all the liabilities and obligations of *each* of the corporations so merged or consolidated * * *." (Our emphasis). Ruidoso was not the surviving or new corporation; that was Ruidoso Downs, Inc. The liability of Newco would be the liability of Ruidoso Downs, Inc. under § 51–27–6(E), supra, but that section does not impose the liability of one of the old corporations (Newco) upon the other old corporation (Ruidoso). Ruidoso was not liable, under § 51–27–6(E), supra, for any liability of Newco under the employment contract.

(c) Ruidoso's ratification.

The issue is whether Ruidoso ratified Culver's employment contract with Sierra. There is testimony in the depositions to support the following:

Hensley's stock sale and the employment agreement were part of the same deal—no sale of stock without an employment agreement. The stock purchase agreement was signed in April, 1969, prior to which a draft of an employment agreement had been discussed by Culver and Hensley. Culver, Hubbard and Mosier discussed an employment contract in May, 1969. The employment agreement was signed June 4, 1969, and on that date the stock purchase agreement was amended.

On July 31, 1969, there was a "closing" at which the Hensley stock was transferred to Newco and cash and a promisso-

ry note were delivered to Hensley. On that date all but one of the directors of Ruidoso were replaced by men who were the controlling stockholders of Newco. These men were Culver, Hubbard, Mosier and Azar. Culver became the president of Ruidoso and, on its behalf, executed an agreement with Newco by which Newco would manage the race track. Hubbard signed for Newco. Both prior to and subsequent to the closing, Hubbard and Mosier represented that Ruidoso would ratify the employment contract.

Checks were drawn on Ruidoso's bank account for the months of August, 1969 through March, 1970. The checks in 1969 indicate the signature of Culver; those in 1970 indicate the signature of Mr. Thompson who was an employee of Ruidoso. All the checks are payable either to Sierra Blanca, Inc. or Sierra Blanca Sales Co. The checks were in the amount of the monthly payments provided for in the employment agreement.

See-Tee Mining Corporation v. National Sales, Inc., 76 N.M. 677, 417 P.2d 810 (1966) states:

"* * * Ratification may be established when the necessary knowledge of material facts is brought home to the corporate board or officers who would have had power to make the contract in question * * *."

The testimony referred to above certainly raises a factual issue as to ratification. Ruidoso, however, claims that, as a matter of law, Ruidoso could not ratify the employment contract. It asserts that the acts of Culver in entering the employment contract were not authorized by Ruidoso; that representations by any of the individuals as to ratification were unauthorized. Once Culver and his associates assumed control of Ruidoso, Ruidoso claims they could not ratify their own unauthorized acts.

Although various decisions are cited in support of this contention, the argument bottoms on the statement found in 2 Fletcher, Cyclopedia Corporations § 761 (Permanent Ed., 1969 rev. vol.): "Ratifi-

cation can never be made on the part of the corporation by the same persons who wrongfully assume the power to make the contract, but the ratification must be by the officer or governing body having authority to make such contract and, as we have seen, must be with full knowledge * * *."

■ We have no quarrel with this general statement; it simply is inapplicable here. The quoted statement refers to those who "wrongfully" assume the power to make the contract. There is nothing "wrongful" in Culver's guarantee to Sierra that he would cause ratification to occur upon assuming an executive position with Ruidoso because in that executive position —president—he would have power to make the contract. See-Tee Mining Corporation v. National Sales, Inc., supra. At least, no contention is made that the president of Ruidoso did not have that power. See Yucca Mining & Petrol. Co. v. Howard C. Phillips Oil Co., 69 N.M. 281, 365 P.2d 925 (1961). The same analysis applies to any representations made by Hubbard and Mosier either prior to or after becoming officers of Ruidoso.

The specific answer to Ruidoso's contention is that there is a distinction between wrongful acts and unauthorized acts. All unauthorized acts are not wrongful; corporations have been frequently held liable for unauthorized acts of their officers. See Yucca Mining & Petrol. Co. v. Howard C. Phillips Oil Co., supra, and cases therein cited.

It is undisputed that at the time of the stock purchase and employment agreements Hensley was a convicted felon. The deposition testimony supports the view that acquisition of Hensley's stock was a benefit to Ruidoso in that removal of Hensley as a stockholder helped protect Ruidoso's race track license. There is testimony that the employment contract with Sierra was a part of the transaction involving the stock sale. Ruidoso, having received the benefit of Hensley's removal as a stockholder, would be charged with the burden of the

allegedly related employment contract with Sierra. Yucca Mining & Petrol. Co. v. Howard C. Phillips Oil Co., supra; Lawrence Coal Co. v. Shanklin, 25 N.M. 404, 183 P. 435 (1919). Thus, ratification of unauthorized acts was not barred as a matter of law.

■ Ruidoso also contends that ratification by it is barred because of public policy. This contention is based on § 60-6-2, supra, which provides that the New Mexico Racing Commission "shall" approve contracts for the payment of money "by any licensee." Ruidoso points out that nothing indicates the employment contract was presented to the Racing Commission for its approval, and that there is support in the record for the view that none of the individuals involved—Culver, Hubbard, Mosier and Hensley—wanted the Racing Commission to be aware of the contract. Ruidoso states: " * * * It necessarily follows * * * that ratification of the contract by a race track licensee requires Racing Commission approval in order to be effective and enforceable * * *." We disagree.

Ruidoso's factual argument would not require a ruling, as a matter of law, that the employment contract could not be ratified by Ruidoso. We agree there is nothing in the record indicating the contract was presented to the Racing Commission; there is also nothing in the record indicating it was not presented. As to the motives of the parties, there is also a showing that the principals of Newco—Culver, Hubbard and Mosier—did not want the employment contract disclosed in order to avoid complications with "lenders"—those who were providing part of the financing for the take-over of Ruidoso by Culver and his associates in Newco.

As we view it, the motives of the parties are not determinative of the issue; the issue being whether the employment contract, if ratified by Ruidoso, was enforceable against it without an affirmative showing that the Racing Commission had approved the contract.

Section 60-6-2, supra, does not require a licensee to obtain the approval of the Racing Commission before the licensee enters a contract. The statutory language refers to approval of contracts and, thus, presupposes an existing contract. Once the contract is entered, submission of that contract to the Racing Commission for its approval appears to be required. If there is no submission for approval, the possible penalty is cancellation or revocation of the racing license. See § 60-6-7, N.M.S.A. 1953 (Repl.Vol. 9, pt. 1). Any such penalty in this case would be applied to Ruidoso. These provisions are not applicable as between Sierra and Ruidoso.

The contract was for employment. It, thus, did not have an unlawful object. The contract does not provide for or require the violation of any law. The contract was not illegal. Measday v. Sweazea, 78 N.M. 781, 438 P.2d 525, 26 A.L.R.3d 1386 (Ct.App.1968).

The language of § 60-6-2, supra, does not make ratification of the contract void. See Hogue v. Superior Utilities, 53 N.M. 452, 210 P.2d 938 (1949). The possible statutory penalty is for failure to submit the contract to the Racing Commission for approval; the penalty is not for entering a contract. Thus, ratification of the contract would not be in violation of a statute providing penalties and not void on that ground. See Measday v. Sweazea, supra.

To enforce the contract against Ruidoso, on the basis that it had ratified the contract, Sierra does not rely on and is not required to prove that the contract was not submitted to the Racing Commission for approval. Thus, Sierra's claim is not based on any statutory violation by it. See Desmet v. Sublett, 54 N.M. 355, 225 P.2d 141 (1950); Measday v. Sweazea, supra. In so holding, we do not decide whether a violation of § 60-6-2, supra, comes within the rule stated in Desmet v. Sublett, supra. We hold only that the rule in Desmet, supra, is inapplicable.

The contract is not illegal, not void, and not unenforceable. The statute, § 60-6-2,

supra, requiring submission of contracts of a licensee to the Racing Commission for its approval does not prevent Sierra from enforcing the employment contract against Ruidoso.

Summary judgment in favor of Ruidoso, either on the basis that there was no factual issue as to ratification or that ratification was barred, as a matter of law or public policy, was erroneous. These being the theories presented concerning Ruidoso's non-liability, the summary judgment in favor of Ruidoso is reversed. This reversal, because of the admission in the pleadings and substitution of parties, also applies to Ruidoso Downs, Inc. and Fortuna Corporation.

## B. The fraud claims.

The fraud claims are asserted only against the individual defendants—Culver, Hubbard and Mosier. There are two claims. First, that each of the defendants induced entry of the employment contract by certain assurances. Second, that after the employment contract was signed and at the "closing" of the stock sale in July, 1969, each of the defendants gave assurances that the contract would be ratified by Ruidoso.

Sauter v. St. Michael's College, 70 N.M. 380, 374 P.2d 134 (1962) states the essential elements of fraud are:

"* * * a representation was made as a statement of fact which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and that the other party did in fact rely on it and was induced thereby to act to his injury or damage * * *."

### 1. The claims against Culver.

Each element of fraud must be established by clear and convincing evidence. Hockett v. Winks, 82 N.M. 597, 485 P.2d 353 (1971). Culver asserts this degree of proof was lacking as to false representations of fact, intent and reliance.

Culver states: " * * * If the personal guarantee of Culver was that he would cause Ruidoso to sign a contract directly with Sierra Blanca, then the most that can be said is that he breached the contract." This contention misses the point.

■ There is evidence that Culver told Hensley, in May, 1969, that he would " * * * personally see that I got my money * * *." Culver made the .written guarantee in June, 1969. There is evidence that the intent of the written guarantee was that Culver would cause Ruidoso to enter the written contract with Sierra when Culver assumed an executive position with Ruidoso. There is evidence that at the closing of the stock transaction Culver promised that Ruidoso would ratify the employment contract. There is evidence that the contract was neither entered nor ratified by Ruidoso. This is evidence of false representations by Culver even though it is, in part, also evidence of Culver's breach of contract.

Culver asserts there is no evidence that he did not intend to abide by his written guarantee at the time he made it. Indirectly, he also asserts an insufficiency of the evidence as to his intent at the time of his alleged oral promise of ratification. Attempting to show an absence of fraudulent intent, Culver relies on his explanation that he did not attempt to have Ruidoso ratify the employment contract because of the alleged condition precedent in that contract. See Point A(1)(f). He also relies on his " * * * apprehension about securing a racing license for the coming season * * *" and delay on the part of Hensley and Frances in bringing the employment contract "out into the open."

While the foregoing is evidence material to the question of Culver's intent, it is not all the evidence. There is evidence that the employment contract was an integral part of the stock sale; that Culver made assurances in connection with that contract; that those assurances have not been carried out; and that Culver made no attempt to have the assurances carried out.

Culver testified that he did not disclose the contract to his business associates—Hubbard and Mosier—and denied the employment agreement was discussed at the closing of the stock sale. Culver admits his presence at the May, 1969 meeting (see Point A(2)), but denies the employment contract was even mentioned at that meeting. The evidence referred to in this paragraph raised a factual issue as to Culver's intent. Telman v. Galles, 41 N.M. 56, 63 P.2d 1049 (1936).

The jury was instructed that Sierra must have justifiably relied on Culver's representations and been damaged as a result of that reliance. There is evidence that Hensley relied on Culver's alleged representations at the May, 1969 meeting and relied on Culver's written guarantee. Culver claims that if he made any false representations, with the requisite intent, they were not made to Sierra and Sierra never acted in reliance thereon. The result, it is contended, is that Sierra has suffered no damage. The point asserted is that the allegedly false representations were made to Hensley, the individual, and not to Sierra, the corporation.

As to the alleged representations at the time of closing, they were not made to Hensley because he was not present. The evidence is that they were made to Hensley's attorney-in-fact.

Hensley signed the employment agreement on behalf of Sierra, as its president. At that time he was a stockholder in Sierra. The employment agreement contained a non-competition agreement applicable to the original stockholders in Sierra (which included Hensley). The closing of the stock sale included an addendum to the stock purchase agreement executed by Hensley's attorney-in-fact. There is evidence that the stock sale and the employment agreement were parts of the same transaction. Sierra has not received the payments provided for in the employment contract.

A corporation can act only through its officers, directors and authorized em-

ployees. Sanchez v. Securities Acceptance Corp., 57 N.M. 512, 260 P.2d 703 (1953). The foregoing raises factual questions as to Sierra's reliance on Culver's representations in entering the employment contract and in closing the stock transaction. The foregoing also raises factual questions as to Sierra's damage as a result of that reliance.

In our opinion, the evidence referred to above is substantial on the questions of false representations, intent and reliance and could be found by the jury to be clear and convincing. Culver's fraud was properly a question for the jury. Durrett v. Petritsis, 82 N.M. 1, 474 P.2d 487 (1970).

### 2. *The claims against Hubbard.*

Hubbard asserts summary judgment in his favor was properly granted because the fraud claims were not properly pleaded, because the first fraud claim (that he would pay the contract) is barred by the Statute of Frauds, and because there are no factual issues concerning the second claim of fraud (ratification).

The pleading involved is the second amended complaint. Here, as in Romero v. Sanchez, 83 N.M. 358, 492 P.2d 140 (1971), Hubbard takes the allegations one by one and argues that each allegation is deficient. Here, as in *Romero*, supra, we feel that in the aggregate the two claims of fraud are alleged with sufficient particularity. See Maxey v. Quintana, 84 N.M. 38, 499 P.2d 356 (Ct.App.1972).

There is deposition testimony that the employment contract was discussed at the meeting in May, 1969. The employment contract was signed in June, 1969. According to Hensley, Hubbard said: " 'We want the race track and we want it bad' "; stated that he understood the employment agreement was part of the [stock] sale and twice commented that if the employment contract was not paid, he would pay it personally. Hubbard contends a fraud claim based on these alleged representations is barred by the Statute of Frauds because the representations to pay were oral prom-

ises to answer for the debt, default or miscarriage of another. See Beacon Supply Company v. American Fiber Corp., 75 N.M. 29, 399 P.2d 927 (1965). In support of this legal defense, Hubbard cites authority to the effect: " * * * that the mere failure to perform an oral promise does not constitute sufficient fraud to render the statute of frauds a nullity * * *."

We do not consider whether the alleged oral representations, in themselves, were "sufficient fraud" to avoid the application of the Statute of Frauds. See Rice v. First Nat. Bank in Albuquerque, supra; Alford v. Rowell, 44 N.M. 392, 103 P.2d 119 (1940). It is not necessary to do so.

■ The Statute of Frauds does not apply to an original promise where the direct and leading object of the promisor is to further or promote some purpose or interest of his own, although the incidental effect of the promise may be to answer for the debt or default of another. Pace v. Springer, 23 N.M. 586, 170 P. 879 (1918); see Peterson v. Rowe, 63 N.M. 135, 314 P. 2d 892, 64 A.L.R.2d 1067 (1957); Banes Agency v. Chino, 60 N.M. 297, 291 P.2d 328 (1955); Bunton v. Campredon, 24 N. M. 314, 171 P. 142 (1918).

There is deposition testimony for the following: The employment agreement was tied to the stock sale. Details of the employment contract had not been finally agreed upon at the time of Hubbard's alleged promise to pay the contract. Hubbard and his associates wanted the race track, " 'we want it bad.' " This testimony supports an inference that Hubbard's object in making the alleged promise to pay was to complete the stock sale, which resulted in Hubbard being one of the principals who controlled Ruidoso.

■ There is a factual question as to whether Hubbard's asserted promise to pay had as its object an interest of Hubbard's own. This factual question prevented a ruling on the Statute of Frauds defense as a matter of law. Raton Wholesale Liquor Co. v. Besre, 49 N.M. 121, 158 P.2d 295 (1945).

As to the second fraud claim—that of ratification—Hubbard contends he could not have had a fraudulent intent and the representations could not have been justifiably relied on to Sierra's detriment. Hubbard's argument is that the asserted promise by Hubbard to cause Ruidoso to ratify the employment agreement occurred on August 1, 1969, which was subsequent to the date of the employment agreement. This contention misappraises the fraud claim involved and also misappraises the deposition testimony.

 The second fraud claim is based on the alleged ratification promise which is asserted to have occurred shortly prior to the closing of the stock sale on July 31, 1969. Thus, the dates involved do not eliminate questions as to Hubbard's intent or Sierra's justifiable reliance to its detriment.

Hubbard also asserts that Sierra did not have the right to rely upon a conditional promise until the required condition occurs. The condition, according to Hubbard, is that the promise of ratification depended on a private meeting. " * * * 'As soon as we get a private meeting, we'll ratify it' * * *." Again, Hubbard misappraises the fraud claim involved and misappraises the deposition testimony. This promise of ratification at a private meeting allegedly occurred *after* the closing of the stock sale. The basis of the second fraud claim is an alleged promise of ratification made *prior* to closing of the sale. The "private meeting" promise may be evidence of Hubbard's intent, and of his alleged false representations of fact, but it is not a part of Sierra's "reliance" claim.

Hubbard also raises a condition precedent argument concerning the employment contract. This argument has been discussed in Point A(1)(f). The answer here is that the contract is ambiguous and whether two separate legal entities were involved in the guarantee depended on the intent of the parties. That is a factual question, not one of law.

There are factual questions as to Hubbard's fraud. The matters raised and discussed under this point do not bar the claims as a matter of law. Summary judgment in Hubbard's favor on the fraud claims was erroneous.

### 3. *The claims against Mosier.*

Mosier makes four arguments in support of the summary judgment in his favor. He adopts the arguments made by Hubbard; these have been answered. He renews the arguments directed against the employment contract. These have been stated, and answered, in Point A(1). He attacks the basis for each of the fraud claims asserted against him.

 As to the first fraud claim, Mosier asserts there is nothing showing that he personally guaranteed that an employment contract would be paid and supports this contention by references to deposition testimony. It may be true that there is no testimony as to a personal guarantee of payment, but this defines the claim too narrowly. The first fraud claim against Mosier is based on his asserted promise that the employment contract would be carried out. At the May, 1969 meeting, according to Hensley, Mosier said: " * * * he was going to buy a bunch of the stock and that they would see that the employment contract was paid * * *." Further, according to Hensley, Mosier said: " * * * that he would see that the thing was carried out * * *."

Mosier contends these alleged assertions could not refer to the employment contract entered by Culver and Sierra in June, 1969, because that contract was not yet in existence and the proposed employment contract sent to Hensley in March, 1969, was never signed and, thus, is not involved in this case. We disagree. There is deposition testimony that employment of Hensley was tied to the stock sale; that questions arose on the part of both Culver and Hensley as to the appropriate form of the employment contract; and that the alleged

representations by Mosier were made in connection with that employment. Mosier overlooks the fact that this first fraud claim is a claim of fraud in inducing entry of the contract signed in June, 1969. See McLean v. Paddock, 78 N.M. 234, 430 P.2d 392 (1967). Sierra claims Mosier fraudulently induced the contract that was entered in June, 1969, and the claim is based on the alleged representations in May, 1969.

As to the second fraud claim, Mosier states: "At the closing of the transaction by which the stock was purchased from Gene Hensley, Mr. Hensley then being in prison, it is claimed that an oral guarantee was made by Mosier that an employment contract would be ratified by Ruidoso. At the time of closing Hensley had no choice about consummating the transaction. He and his former wife had agreed to sell for the price and on the terms and conditions set forth in their agreement * * *." According to this argument, Sierra could not have relied on Mosier's alleged ratification promise because at the closing Hensley did only what he was already legally bound to do. See Kisella v. Dunn, 58 N.M. 695, 275 P.2d 181 (1954).

This argument overlooks the fact that an addendum to the stock sale agreement was entered on July 31, 1969. This addendum recites that it is made for " * * * purposes of security to Eugene V. Hensley * * *." There is deposition testimony that the employment agreement was an integral part of the stock sale; that negotiations in connection with the stock sale continued up to the actual closing at which the stock was transferred. Thus, the asserted absence of reliance on Hensley's part is not a matter of law; it is a question of fact.

Mosier also asserts: " * * * Any claimed statement made by Mosier at the time of closing would have been a mere gratuity without any consideration * * *." The answer is that we are not concerned here with contracts, but a claim of fraud. Sauter v. St. Michael's College, supra, does not require consideration as a prerequisite to recovery for fraud.

Mosier's other contentions are based on the asserted distinction between All American and Ruidoso. These have been previously answered. There are factual issues as to Mosier's fraud. The matters raised and discussed under this point do not bar the claims as a matter of law. Summary judgment in Mosier's favor on the fraud claims was erroneous.

### C. *Newly discovered evidence.*

Culver moved for a new trial on the basis of newly discovered evidence. Hensley, on the witness stand, admitted his felony convictions involving the federal income tax law. Hensley was asked if he had been convicted of any other crime. He answered: "Yes, a misdemeanor." He explained: "It was a records case in Arizona."

Culver's motion asserts that the "other crime" was not one misdemeanor but was twenty-four felonies; further, that the "records case" was in fact a conspiracy to make false entries contrary to federal law. The motion states that Hensley's credibility was a major issue before the jury and: " * * * The fact that Eugene V. Hensley had been convicted of 24 felonies, rather than one misdemeanor, was material to his credibility and, in particular because they involved falsification." Culver claims denial of the motion for a new trial on the basis of newly discovered evidence was error. We disagree.

The New Mexico Supreme Court has listed six requirements for obtaining a new trial on the basis of newly discovered evidence. Mitchell v. Forster, 59 N.M. 226, 282 P.2d 708 (1955); State v. Luttrell, 28 N.M. 393, 212 P. 739 (1923). Two of the six requirements are that the newly discovered evidence: (a) must not be merely cumulative to the former evidence and (b) must not be merely impeaching or contradictory to the former evidence.

The purpose of questioning a witness as to prior convictions is to test the credibility of the witness. State v. Coca, 80 N.M. 95, 451 P.2d 999 (Ct.App. 1969). Here, the newly discovered evidence as to prior convictions could only be used for impeachment and would have been cumulative to the impeachment testimony introduced at the trial. The granting or denial of a motion for new trial is within the court's discretion and is not reviewable except for an abuse of that discretion. Trinidad Industrial Bank v. Romero, 81 N.M. 291, 466 P.2d 568 (1970); Mitchell v. Forster, supra. The circumstances here do not show an abuse of discretion.

### D. Damages.

#### (1) Form of the verdict.

The form of the jury verdict against Culver, returned by the jury, reads:

"We find for plaintiff in the sum of $215,000.00 as compensatory damages and in the sum of $150,000.00 as punitive damages."

Culver contends this form of verdict is misleading. He asserts the two blanks in the verdict form indicate that if the blank for compensatory damages is filled in " * * * the blank for punitive damages should also be filled in * * *." Before the trial court, Culver asked that "if any" be added to the portion of the verdict dealing with punitive damages, " * * * otherwise, * * * there is an implication that they [the jury] have to find something in both."

The jury was instructed that punitive damages could not be awarded "[u]nless compensatory damages are first found * * *." It was also instructed on what basis the jury "may" award punitive damages. Thus, the jury was informed that it was not required to award punitive damages if it awarded compensatory damages. In the light of this instruction, we cannot say the form of the verdict misled the jury since it could have filled in a zero amount in the punitive damage blank.

Callaway v. Olguin, 83 N.M. 767, 497 P.2d 978 (Ct.App.1972). Further, we note inferential approval of the verdict form used here in Vickrey v. Dunivan, 59 N.M. 90, 279 P.2d 853 (1955).

#### (2) Compensatory damages.

In its opening statement, Sierra informed the jury that after the payments made on the employment contract, $215,000.00 was "due and owing." Culver points out that "[n]ot one dime" was taken from the $215,000.00 demanded as compensatory damages. He asserts that the " * * * jury plainly reacted in this case in sympathy * * *."

Culver also argues that the evidence is insufficient to support the compensatory damages awarded; that the verdict was excessive, the result of passion and prejudice, based upon speculation and in disregard of the court's instructions. We disagree.

The jury was instructed that the measure of damages was:

"The value of profits lost and the present cash value of the profits reasonably certain to be lost in the future. The value of the lost profits is the loss of the gross amount plaintiff would have had if defendant Culver had not wrongfully conducted himself, offset by amounts that plaintiff itself would have had to spend."

This instruction was requested by Culver and given in the form requested. Thus, under defendant's own instruction, the starting point for the compensatory damages is the "gross amount" Sierra would have received. The proof as to this is $215,000.00. The award in this amount then cannot be said to be based on sympathy or speculation.

The jury was told to reach the value of lost profits by starting with the gross amount Sierra would have received " * * * offset by amounts that plaintiff itself would have had to spend." Culver contends Sierra had expenses in performing under the contract; that those consist-

ed of compensation paid to Hensley for his services and expenses of Frances Hensley in promoting the horse sales. Culver provides a partial answer to his own contention when he states: "* * * Had the jury reduced the gross amount of $215,000 for any expenses whatever it would have been purely speculation since there was no evidence as a predicate for such reduction." Thus, to the extent there is an absence of evidence of expenses, the jury could not have offset an amount for which there is no evidence.

There is evidence of a certain amount of expenses, and the jury did not offset those amounts. We cannot say the jury disregarded the instruction in failing to do so. The employment contract states:

"* * * The services to be rendered by the Sierra Blanca consist of securing entries for horse sales of any and all kinds presently being conducted by All American, or in the future and during the term of this contract conducted by All American or Ruidoso Racing Association, Inc., promoting buyer and seller interest in such sales, assisting in the conduct thereof, *if requested by All American or Ruidoso Racing Association, Inc.*, or the successor of either, and the rendering of expert consultation *upon request* with respect to racing and horse sales. . . ." (Our emphasis)

Culver asserts that Sierra had definite duties to perform under the contract and necessarily would have expenses in connection with that performance. Sierra responds that it had no duties to perform unless requested. Culver argues that the material first underlined above, concerning requests, ". . . relates solely to the one duty of 'assisting in the conduct thereof'. . . ." In the light of the phraseology of the paragraph down to the first underlining, and a second reference to a "request" later on in the same paragraph, our view is that the paragraph is ambiguous and oral evidence of the intent of the parties was properly admitted. See Point A(1)(a). Evidence introduced as to the intent of the

parties is to the effect that Sierra was to perform services only as requested.

There is evidence that eight payments were made under the contract without any services being requested of Sierra. There is evidence that Culver offered Hensley $100,000.00 for a ten year non-competition agreement, and this figure was in addition to an offer for the Hensley stock at the price ultimately paid for the stock. Negotiations continued subsequent to this offer, which was in January, 1969. When the employment contract was signed in June, 1969, the non-competition agreement was for fifteen years.

This evidence supports the view that the employment contract did not contemplate any services on the part of Sierra unless requested, and that the primary purpose of the contract was to provide for non-competition on the part of Hensley. The jury could draw this inference from the evidence and under this view there would be nothing to offset from the gross amount.

Thus, under the evidence, we cannot say that the jury disregarded the instruction; that the verdict was excessive, or that the verdict resulted from passion and prejudice. Our decision is that the foregoing evidence, which is substantial, supports the amount of the verdict for compensatory damages.

(3) *Punitive damages.*

Another instruction informed the jury that in fixing the amount for damages arising in the future, allowance was to be made for the fact that any award, properly invested, would bear interest. The jury was told to allow a reasonable discount for the earning power of money and thereby arrive at the present cash value of total future damages.

In returning a verdict for compensatory damages of $215,000.00, the jury obviously failed to follow this instruction because the term of the contract was for fifteen years from June, 1969. The trial court granted a remittitur of the compensatory damages on the basis of a 6% discount rate. The re-

mittitur was $57,609.08. Judgment for compensatory damages of $157,390.92 and punitive damages of $150,000.00 was entered.

Culver contends: "In the case of punitive damages there is a limit of the amount that a jury may award * * *." He seems to assert that the amount of punitive damages in this case shows passion and prejudice.

We agree there are limits to the amount that may be awarded for punitive damages. Those limits are stated in Faubion v. Tucker, 58 N.M. 303, 270 P.2d 713 (1954):

"* * * the amount of punitive damages must be left to the jury's sound discretion based on the circumstances of each individual case, but must not be so unrelated to the injury and actual damages proven as to plainly manifest passion and prejudice rather than reason and justice * * *."

■ Here, the ratio of the punitive damages to the compensatory damages, after the remittitur, is approximately 1 to 1. Other decisions have approved awards of punitive damages where the ratio of punitive to compensatory damages was far greater. Faubion v. Tucker, supra; Galindo v. Western States Collection Company, 82 N.M. 149, 477 P.2d 325 (Ct.App.1970); Sweitzer v. Sanchez, 80 N.M. 408, 456 P. 2d 882 (Ct.App.1969).

Considering the circumstances of this case, the relation of the punitive damages to the compensatory damages, and the relation of the punitive damages to evidence which supports the view of a willful and wanton attempt to deprive Sierra of the benefits contracted for, we cannot say, as a matter of law, that the punitive damage award plainly manifests passion and prejudice. Therefore, we sustain the discretion exercised by the jury in making the award. Galindo v. Western States Collection Company, supra; Sweitzer v. Sanchez, supra.

The judgment against Culver in cause 898 for compensatory and punitive damages is affirmed.

The summary judgments in cause 846 are reversed to the following extent:

(a) Breach of contract claim against Newco, Ruidoso Downs, Inc. and Fortuna Corporation on the theory that Culver was the agent of Newco in entering the employment contract with Sierra.

(b) Breach of contract claim against Ruidoso, Ruidoso Downs, Inc. and Fortuna Corporation on the theory that Ruidoso ratified the employment contract between Culver and Sierra.

(c) The two fraud claims (identified in this opinion) asserted against Hubbard.

(d) The two fraud claims (identified in this opinion) asserted against Mosier.

It is so ordered.

HENDLEY and COWAN, JJ., concur.