867 P.2d 1189

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Manuel CHAVEZ, Defendant–Appellant.**

**No. 13549.**

Court of Appeals of New Mexico.

Aug. 19, 1993.

Certiorari Denied Jan. 10, 1994.

Tom Udall, Atty. Gen., Joel Jacobsen, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Sammy J. Quintana, Chief Public Defender, David Henderson, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

## OPINION

BLACK, Judge.

■ Defendant appeals from his convictions for second degree murder, two counts of tampering with evidence, and conspiracy to tamper with evidence. He raises five issues on appeal: (1) error in failing to grant a motion for new trial based on the State's suppression of material evidence; (2) error in failing to grant a motion for new trial based on the recantation of testimony by the State's key witness; (3) admission of evidence in violation of the spousal privilege; (4) sufficiency of the evidence; and (5) cumulative and fundamental error in the prosecutor's closing argument. Issues listed in the docketing statement but not briefed are deemed abandoned. *See State v. Fish*, 102 N.M. 775, 777, 701 P.2d 374, 376 (Ct.App.), *cert. denied*, 102 N.M. 734, 700 P.2d 197 (1985). Since the record is sufficient to enable us to evaluate the merits of the second and third issues we deny Defendant's contingent motion to remand for an evidentiary hearing and we affirm.

### FACTS

On December 31, 1989, Defendant and his wife, Stacey Chavez, had a New Year's Eve party at their mobile home. Darl "Pops" Hicks, Debbie McDaniel, and her friend, Les Hall, attended the party. Everyone drank very heavily and the group consumed four or five marijuana cigarettes. Hall also inhaled four or five lines of cocaine and swallowed "some pills."

As Hall continued to consume alcohol and drugs, his mood soured. He made several disparaging and hostile remarks to Defendant during the evening, including a statement that Defendant had two women; this was presumably a reference to Defendant's affair with McDaniel. Sometime before midnight, Hall got up, remarked that the others were spoiling the party, and left. Defendant told McDaniel that Hall was leaving to get more cocaine and that he was coming back.

Between 1:00 and 2:00 a.m., the group heard a loud truck outside the trailer. Defendant said it sounded like Hall was back. There is some dispute as to exactly when, or why, but at least by the time Hall returned, Defendant had placed his derringer in his back pocket. When Hall reentered the trailer, the two women went into the back bedroom, leaving Defendant and Hicks in the kitchen.

Hall entered without knocking, holding a whiskey bottle in his hand, and accused Defendant and Hicks of stealing his winning Colorado lottery ticket. Hall and Defendant pushed each other, and Hall shattered a glass table top with the whiskey bottle. Since the glass table had been a wedding gift, Defendant was angry and demanded to know who would pay for it. Hall either stumbled or was pushed out the door. According to Defendant, Hall then threatened to get a gun and kill "all of you sons of bitches."

When Hall began walking quickly toward his truck, where Defendant knew Hall kept a gun, Defendant followed him. Defendant testified: "That's when I pulled my gun out of my back pocket and fired a warning shot and said, 'Don't do it, Les, don't do it, I got the drop on you.'" Defendant said that Hall reached the door of his pickup and was "within arm's reach" of his gun. Defendant testified, "He turned on me and we had a struggle for my gun and he tried to trip me and take my gun away and the gun went off." Hall's body was discovered in his truck off a dirt road south of Bloomfield on New Year's Day.

### THE FIRST MOTION FOR NEW TRIAL

When initially questioned by a state police officer, Stacey Chavez admitted Hall had been in their home New Year's Eve, but insisted he left after dinner and never returned. On January 6, 1990, Stacey Chavez gave a formal statement to state police officer Lonnie Valencia and a local officer. Af-

ter Stacey repeated the story that Hall never returned, she was asked if she heard gunshots. At her request, the tape recorder was then shut off.

At some point during the ensuing discussion, the prosecutor, Assistant District Attorney Craig Westberg, was contacted. Westberg told Stacey that she would be given immunity from prosecution if she cooperated. Stacey then admitted that Hall had returned after midnight. She described how he had argued with Defendant, and Hall had been forced to leave. Stacey told the police that Hall fell or was pushed from the porch. She said Hall threatened to get his gun and shoot them and ran off into the darkness towards his truck. She heard her husband shout, "Don't do it Les, don't do it," and a shot. A few seconds later, she said she heard a second, muffled, gunshot. When she went outside, she saw Hall lying still on the ground. Stacey admitted to the police that she and the others had decided to get rid of the body and hide the evidence. At her request, the police took Stacey and her children to a "safe house," as she was afraid Defendant would be angry that she did not stick with her story.

After a preliminary hearing in February, Defendant was bound over for trial on charges of second degree murder, conspiracy, and tampering with evidence. Stacey Chavez was not called as a witness.

About four months after the preliminary hearing, Stacey Chavez took her children and moved to Grand Junction, Colorado. Sometime during this stay in Colorado, Stacey told a pastor and a counselor that she had lied to police when she said she had not seen the shooting. Her counselor contacted Officer Valencia and told him that Stacey wanted to change her story. Officer Valencia travelled to Colorado and took a third statement from Stacey. It differed in two main respects from the second story. Stacey now claimed that Hall had made no threats when he was ejected from the trailer, and she claimed to have actually witnessed the shooting. As a result of Stacey's new recitation, the State moved to amend the criminal complaint to charge Defendant with first degree murder.

Before the second preliminary hearing, however, Stacey Chavez moved back in with Defendant. She also contacted Defendant's attorney and said she wished to recant her third story. She insisted the second statement was correct.

Within a few days of her conversation with Defendant's lawyer, Stacey placed another phone call, this time to the District Attorney's Office. She stated that she needed help to get herself and her children out of the house. In response to her call, the prosecutor and a witness coordinator from his office drove out to the Chavez trailer, picked up Stacey and her children, and took them to another "safe house." Stacey appeared as a witness at the second preliminary hearing, and testified in a manner consistent with her third statement to Officer Valencia.

Following her testimony at the second preliminary hearing, Stacey again took the children and moved back to Grand Junction. While in Colorado, she instituted divorce proceedings against Defendant. She agreed, however, to let Defendant come up and see the children during the Easter weekend of 1991. Defendant also spent the weekend prior to his trial with his wife and children in Grand Junction. During this visit, Stacey called Defendant's lawyer and indicated that she had informed the New Mexico police she would not testify at trial. Defense counsel apparently told her a New Mexico subpoena would not be valid in Colorado and there was nothing New Mexico authorities could do to her if she did not come to Defendant's trial.

The prosecutor then contacted the Colorado attorney who was representing Stacey in her divorce action. That attorney contacted Stacey and told her that it would be a mistake not to cooperate with the New Mexico authorities. On April 14, after Defendant left Grand Junction to return for his trial the next day, Officer Valencia went to talk to Stacey in an attempt to persuade her to testify at trial.

On April 15, the prosecutor ordered that a warrant be prepared for the arrest of Stacey Chavez. The warrant was obtained through a magistrate judge, without the knowledge of the district judge presiding over Defendant's trial. On the first day of Defendant's trial,

Stacey was arrested and underwent extradition proceedings in Colorado. The prosecutor then discussed the immunity agreement with Stacey's court-appointed Colorado attorney. After conferring with counsel, Stacey decided to waive extradition. Upon returning to New Mexico, she was released upon her own recognizance.

At trial, Stacey testified much as she had at the second preliminary hearing. Defense counsel was unaware of her arrest, but cross-examined Stacey repeatedly and at great length about the immunity agreement and her inconsistent renditions of the New Year's Eve events. Defendant was convicted.

After trial, defense counsel reviewed the San Juan County Detention Center arrest records. He found that on the first day of Defendant's trial, Stacey Chavez had been booked on charges of conspiracy and tampering with evidence. Defense counsel then moved for a new trial based on the State's failure to disclose Stacey's arrest.

■ Defense counsel argues Defendant was deprived of his right to due process under the United States Constitution. He reasons that, since the prosecutor knew Stacey Chavez had been arrested and suppressed this fact, the three-part test enunciated in *State v. Chouinard*, 96 N.M. 658, 634 P.2d 680 (1981), *cert. denied*, 456 U.S. 930, 102 S.Ct. 1980, 72 L.Ed.2d 447 (1982), rather than the six-prong test set forth in *State v. Volpato*, 102 N.M. 383, 696 P.2d 471 (1985), should apply. Applying *Chouinard*, we affirm. The three-part test adopted by *Chouinard* to determine whether deprivation of evidence is reversible error requires the following:

1) The State either breached some duty or intentionally deprived the defendant of evidence;

2) The improperly "suppressed" evidence must have been material; and

3) The suppression of this evidence prejudiced the defendant.

96 N.M. at 661, 634 P.2d at 683 (citing *State v. Lovato*, 94 N.M. 780, 782, 617 P.2d 169, 171 (Ct.App.1980)). As we understand *Chouinard*, the substance of the meaning of the term "material" is consistent with the meaning adopted by the United States Supreme Court in applying *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We affirm because the suppressed evidence was not "material."

The concept of "materiality" was applied in the context of prosecutorial misconduct in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). In *Bagley*, the government responded to the defendant's discovery requests regarding " 'any deals, promises or inducements made to witnesses in exchange for their testimony' " by providing affidavits from the witnesses recounting their dealings with the defendant and with federal agents and concluding that the witnesses' statements were made without any threats or promises of reward. 473 U.S. at 669–70, 105 S.Ct. at 3377. The defendant waived his right to jury trial and these witnesses testified at the trial, which resulted in the defendant being found guilty on numerous narcotics charges. Subsequently, and in response to Freedom of Information Act requests, defense counsel received copies of contracts between the witnesses and government agents stating the witnesses would assist the government in providing information on violations committed by the defendant and testify in federal court and the " 'United States will pay to said vendor a sum commensurate with services and information rendered.' " *Id.* at 671, 105 S.Ct. at 3378. Handwritten dollar amounts were written on a line entitled " 'Sum to Be Paid to Vendor.' " *Id.*

Bagley's counsel moved to vacate the sentence on the ground the government had suppressed material evidence. *Id.* at 671–72, 105 S.Ct. at 3377–78. The federal district court found beyond a reasonable doubt that this evidence would not have altered its verdict and denied the motion. *Id.* at 673, 105 S.Ct. at 3378. The Court of Appeals for the Ninth Circuit reversed, holding the prosecution's failure to disclose the requested information severely impaired defense counsel's ability to conduct effective cross-examination. *Id.* at 673–74, 105 S.Ct. at 3378–79. The United States Supreme Court reversed the Court of Appeals. The majority pointed out that at least since *United States v. Agurs*,

427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), a conviction must be reversed "only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381; *see also id.* at 685, 105 S.Ct. at 3385 (White, J., concurring in part and concurring in the judgment). Speaking for the Court, Justice Blackmun then set forth the test of "materiality":

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Id.* at 682, 105 S.Ct. at 3383. The Supreme Court has recently reiterated that evidence is "material," and due process is violated, only if there is a reasonable probability that if the evidence had been disclosed to the defendant the result of the proceeding would have been different. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987); *Boyde v. California*, 494 U.S. 370, 380 n. 4, 110 S.Ct. 1190, 1198 n. 4, 108 L.Ed.2d 316 (1990). *But see* Tom Stacy & Kim Dayton, *Rethinking Harmless Constitutional Error*, 88 Colum.L.Rev. 79, 107 (1988) (arguing because the Court has adopted rules with insufficient deterrent effect, the reliability of guilty verdicts is automatically implicated).

The *Bagley* definition of "material" has appeared in opinions by our Supreme Court. *State v. Fero*, 107 N.M. 369, 371, 758 P.2d 783, 785 (1988). Our Supreme Court conveyed the same message regarding the meaning of "material" when it said that evidence is material when " 'there is a realistic basis, beyond extrapolated speculation, for supposing that availability of the lost evidence would have undercut the prosecution's case.' " *State v. Riggs*, 114 N.M. 358, 361, 838 P.2d 975, 978 (1992) (quoting *Chouinard*, 96 N.M. at 663, 634 P.2d at 685). This Court has also adopted the *Bagley* definition of "material." *State v. Baca*, 115 N.M. 536, 541, 854 P.2d 363, 368 (Ct.App.), *cert. denied*, 115 N.M. 545, 854 P.2d 872 (1993).

In denying the motion for a new trial in the present case, the district judge stated that while he was "personally offended by not being made aware of the arrest of the witness, Stacey Chavez ... the court finds ... its faith in the jury verdict is not shaken by such failure to disclose and that the court believes that the outcome of the trial would not have been changed by that disclosure." The district court supported this conclusion as follows:

> The court notes in so finding that the testimony of the witness, Stacey Chavez, at the time of trial, was essentially consistent with that evidence in testimony which she gave when she testified in the second preliminary hearing in this case. The court further finds that the fact of the grant of immunity on the part of the State in return for the testimony of the witness, Stacey Chavez, was adequately covered during the course of the trial, during the examination of the witness, Stacey Chavez, and that therefore, further impeachment in that regard would not have materially effected [sic] her credibility and therefore, would not have effected [sic] the outcome of the jury's verdict.

The trial court is in the best position to evaluate the evidence of prejudice. Our review is for an abuse of discretion. *See Riggs*, 114 N.M. at 361, 838 P.2d at 978. Pursuant to *Chouinard* and *Bagley*, we find no abuse of discretion on this record. As the district court noted at trial, Stacey repeatedly admitted to lying about the three different versions of the events she had provided police. Stacey also admitted before the jury that she was testifying under an immunity agreement. On cross-examination, Stacey further admitted that the authorities had warned her that if she refused to testify, Defendant would probably be acquitted, while she would face prosecution for tampering with evidence and Defendant might be awarded custody of their children. Defense counsel acknowledged during closing argument that Stacey was being emotionally pulled by both Defendant and the State. He also suggested to the jury that Stacey was motivated in part by the fear of criminal prosecution and the related concern that she would lose her children if convicted.

Other courts faced with allegations of prosecutorial misconduct in withholding evidence of pressure on witnesses have found such evidence not to be material in analogous factual situations. *See, e.g., United States v. Abello–Silva*, 948 F.2d 1168 (10th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992); *cf. State v. Ruble*, 372 N.W.2d 216 (Iowa 1985) (arrest of witness after testifying). We are not persuaded that the district court abused its discretion in ruling that evidence of Stacey's arrest would not have added anything to the information already before the jury.

This should not, however, be misconstrued as approval of the prosecutor's conduct in this case. A lawyer is obligated to make a reasonably diligent effort to comply with a legally proper discovery request and may not obstruct another party's access to evidence. SCRA 1986, 16–304 (Repl.Pamp.1991). Nor may a lawyer engage in conduct which misleads the court. SCRA 1986, 16–102(D) (Repl.Pamp.1991).

### SECOND MOTION FOR NEW TRIAL

■ Defendant filed a second motion for new trial some ten months after his conviction, alleging newly discovered evidence. Defendant claimed that, in a taped telephone conversation with defense counsel, Stacey admitted she had lied under oath. On that tape, Stacey told defense counsel that Defendant was using their children to hurt her: "My daughter, she hates me because of things that [Defendant] tells her...." Defense counsel suggested Defendant probably told their daughter "that you lied at trial and he ended up in jail and the fact of the matter is that you did lie at trial and he ended up in jail." Stacey replied, "Yeah, I did...." The district court examined the new evidence and denied the motion, finding:

> [T]he Court perceives nothing new. The fundamental problem is still the credibility of Stacy Chavez; the issue is not the message, it is the messenger.... Consequently, the Court finds that whatever Ms. Chavez may come up with can merely be impeaching, further contradictory, or both, is fundamentally nothing new, and will not likely change the result if a new trial is

granted, and concludes that the Motions are not well taken.

■ To receive a new trial based on newly discovered evidence, a defendant must demonstrate that the evidence will probably lead to a different outcome. *See Volpato*, 102 N.M. at 384, 696 P.2d at 472. After the trial court reviewed a redaction of the taped conversation between Stacey and defense counsel, it denied the motion on the grounds that Stacey's new comments, even if impeaching and contradictory, would not likely change the result if a new trial was granted. The trial court's decision is reviewed under the "arbitrary, capricious or beyond reason" standard of *State v. Fero*, 107 N.M. 369, 372, 758 P.2d 783, 786 (1988).

Even if we assume that Defendant is correct in interpreting Stacey's comments to defense counsel as an admission she lied at trial, and that she was pressured to do so by the State, such evidence would merely be further impeachment and cumulative. Defendant argues that this new evidence is not merely impeaching because it is an admission that Stacey lied under oath rather than just circumstantial evidence of continuing dishonesty. As we have noted, Stacey repeatedly admitted she had lied to Defendant, police officers, and defense counsel. Absent the evidence's impeachment value it could not have any bearing on Defendant's innocence. *Cf. Sierra Blanca Sales Co. v. Newco Indus., Inc.,* 84 N.M. 524, 541, 505 P.2d 867, 884 (Ct.App.) (newly discovered evidence not sufficient to require a new trial in civil case if it could only have been cumulative to impeachment testimony previously introduced at trial), *cert. denied,* 84 N.M. 512, 505 P.2d 855 (1972). The district court did not think such evidence would likely change the result if a new trial was granted, and we do not find this decision to be arbitrary, capricious, or beyond reason.

### TESTIMONY IN VIOLATION OF SPOUSAL PRIVILEGE

Pursuant to *State v. Franklin*, 78 N.M. 127, 428 P.2d 982 (1967), Defendant claims that Stacey's testimony as to three statements he made to her was admitted in violation of SCRA 1986, 11–505. Defendant does not explain how this contention was pre-

served, nor does he argue that admission of the testimony was fundamental error. Accordingly, we affirm on this issue. *See* SCRA 1986, 12–216(A) (Repl.1992) (to preserve a question for review, it must appear that a ruling by the trial court was fairly invoked).

### SUFFICIENCY OF THE EVIDENCE

■ While Defendant argues that the State failed to present substantial evidence, he does not relate his argument to the convictions for tampering with evidence and conspiracy to tamper with evidence. Accordingly, we affirm those convictions. *See Wilburn v. Stewart,* 110 N.M. 268, 272, 794 P.2d 1197, 1201 (1990) (issues raised in passing without citation to authority will not be reviewed on appeal).

With respect to the charge of second degree murder, Defendant's principal contention is that the jury could not reasonably rely on Stacey's testimony because it was inherently improbable and unsubstantiated by other evidence. We recognize that Stacey did acknowledge doubt as to her ability to perceive and recall the events at issue. However, she also testified that she was clear enough in her own mind to know and observe what was going on, believed that she knew what happened, and had no doubt that she saw Defendant shoot Les Hall.

In our view, Defendant's argument that Stacey's testimony was inherently improbable focuses on her equivocation on cross-examination and ignores her statements at trial that she believed her trial testimony was accurate and truthful. The standard set forth in *State v. Till,* 78 N.M. 255, 430 P.2d 752 (1967), *appeal dismissed and cert. denied,* 390 U.S. 713, 88 S.Ct. 1426, 20 L.Ed.2d 254 (1968), limits inherently improbable testimony to: (1) statements which are physically impossible, and (2) statements the falsity of which is apparent without resort to inferences or deductions. The applicability of the first category in *Till* is not at issue here. Nor can we say, based on Stacey's complete testimony, that the second category applies.

Defendant's relationship with Stacey was violent. Defendant admitted he sometimes hit Stacey and that she went to Durango in the fall of 1989 in order to receive counseling

for battered wives. Stacey also testified Defendant had beaten her prior to the time he shot Les Hall. Stacey's different versions of the New Year's Eve events, based on her relationship with Defendant, follow a pattern: when she was living with Defendant, she followed his instructions and testified in ways to help his case. This hardly proves her testimony was unreliable in toto. *See Mascarenas v. Jaramillo,* 111 N.M. 410, 412, 806 P.2d 59, 61 (1991) (trier of facts weighs the testimony, determines credibility of witnesses, reconciles inconsistent or contradictory statements of a witness, and determines where the truth lies).

The State also introduced additional evidence which dovetails with, and strongly supports, the version of events Stacey related at trial. For example, Debbie McDaniel also testified that Hall was sixteen feet away from his truck when she saw him lying on the ground, not moving. This is evidence which corroborates Stacey's testimony that Hall did not pose a threat and which rebuts Defendant's testimony that Hall was within arm's reach of his own gun when Defendant grappled with him.

Darl "Pops" Hicks testified that he heard a lot of foul language but no threats after Defendant threw Hall out the front door. When Hicks went outside he saw Defendant and Hall fighting. Hall was lying on the ground, on his back, and Defendant was "probably sitting on top of him." Again, this is consistent with Stacey's, not Defendant's, version of the shooting.

Dr. Sparks Veesey, the forensic pathologist who performed the autopsy on Hall, concluded that Hall was paralyzed by the bullet, losing the ability to control his lower body. This is inconsistent with Defendant's testimony that Hall continued to fight and cuss him after the shot and consistent with Stacey's testimony Hall lay still after the shot.

Lauren Gardner, another resident of the trailer park, testified that she heard gunshots, and then a yell that she described as "frantic, very loud, very frantic, terrorized, I don't know, just a horrible type of yell." The person screamed "Medic!" This testimony is

also more consistent with Stacey's testimony than Defendant's testimony that Hall continued to struggle after being shot.

Defendant admitted he hit Hall twice in the head with the butt of a shotgun to "find out if he was faking." Defendant testified that he struck Hall to "wake him up," and he chose to strike Hall with a shotgun rather than another implement because "gunplay is gunplay." This testimony, along with Defendant's admission that he kicked Hall in the stomach after shooting him, is corroborative evidence of his murderous intent.

Defendant admitted that he and the others created the false story that Hall left the party and never came back. There was also evidence Defendant attempted to bribe a prosecution witness, the teenage babysitter who was at the party early in the evening of December 31. Defendant also acknowledged his role in disposing of both his gun and Hall's, as well as Hall's body. This was evidence from which the jury could have inferred that Defendant was conscious of his guilt. *See State v. Vallejos*, 98 N.M. 798, 800, 653 P.2d 174, 176 (Ct.App.), *cert. denied*, 99 N.M. 47, 653 P.2d 878 (1982).

On cross-examination, Defendant said that he felt remorse about the killing. He also denied bragging about the incident and agreed that bragging would not show remorse. However, the State introduced rebuttal testimony to the effect that Defendant bragged repeatedly to others about his role in killing Hall. During a disturbance at a local bar when Defendant threatened to kill another patron, the bartender quoted Defendant as saying, "he shot before and he could shoot again." Defendant told the officer who investigated the bar fight, "I have a reputation in this town that I live up to"; Defendant then tried to "stare down" the police officer. Defendant also said, "I killed for my old lady (or wife), and I'll kill for her again because I intend to get her back." This is consistent with testimony that Defendant found out Stacey was involved in a relationship with Hall.

We hold that Stacey's testimony is not inherently improbable and that, in combination with other evidence admitted at trial, it was sufficient to enable the jury to conclude that the State proved each element of second degree murder beyond a reasonable doubt. *See State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992) (standard of review).

## THE PROSECUTOR'S CLOSING ARGUMENT

■ Defendant argues the case should be reversed "because of cumulative, fundamental error in the prosecutor's closing argument." The prosecutor characterized Defendant as a "loose cannon," a "macho tough guy," and a "very, very dangerous" person who was "perfectly capable of doing what Stacey told you he did." The language used here is not as abusive as the comments in *State v. Diaz*, 100 N.M. 210, 214, 668 P.2d 326, 330 (Ct.App.1983) (prosecutor referred to the defendant as a "yo yo," "stupid," a "thief," and a "crook"). Moreover, in view of facts in evidence regarding Defendant's bragging about the killing and his ability to kill again, the prosecutor's language could arguably be justified. *See id.* (even abusive language may be proper if appropriate to the facts in evidence).

■ The prosecutor also told the jury that if it did not intervene, "he'll do it again." Defendant himself testified that he would kill again in the same circumstances and said he did not know if there would be a "next time." This argument could, then, be seen as fair comment on the evidence. *See State v. Hernandez*, 104 N.M. 268, 275, 720 P.2d 303, 310 (Ct.App.), *cert. denied*, 104 N.M. 201, 718 P.2d 1349 (1986).

■ The prosecutor further argued, "Defendant is the one who suffers the most from the truth in a criminal trial. It is axiomatic if you think about it. He always suffers from the truth. And he wants you to ignore the truth. He wants you to ignore the testimony of Stacey . . . ." We do not see this argument as an impermissible attempt to shift the burden of proof. In our view, this is no more than an argument that the incriminating evidence introduced at trial, including Stacey's testimony, was truthful and adequate to meet the State's burden of proof. "A prosecutor may make comments about the evidence, and is given latitude in his closing argument, in which he may discuss inferences which can

be drawn from the evidence." *State v. Calvillo,* 110 N.M. 114, 119, 792 P.2d 1157, 1162 (Ct.App.), *cert. denied,* 110 N.M. 72, 792 P.2d 49 (1990).

■ Defendant contends that the prosecutor impermissibly told the jury that it should consider evidence that Defendant had previously bragged about killing Hall and that Defendant had previously committed domestic violence against Stacey, as evidence of his guilt. We are not persuaded. When evidence is admissible as to one purpose but not another the judge, *upon request,* shall restrict the evidence to its proper purpose and instruct the jury accordingly. SCRA 1986, 11–105; *State v. Wyman,* 96 N.M. 558, 560, 632 P.2d 1196, 1198 (Ct.App.1981). There is no indication that a limiting instruction was requested to limit the purposes of this evidence.

■ Defendant characterizes the argument that Stacey was a resolute witness as error because the prosecutor knew that Stacey had equivocated about testifying as recently as the weekend before trial. However, the prosecutor did not argue that Stacey was resolute in her decision to testify against Defendant. Rather, he argued that Stacey was adamant, unshakable, and resolute with respect to her answers at trial.

Since we hold that none of the prosecutor's arguments constituted error, there can be no cumulative error. *See State v. Larson,* 107 N.M. 85, 86, 752 P.2d 1101, 1102 (Ct.App.), *cert. denied,* 107 N.M. 74, 752 P.2d 789 (1988).

We affirm.

IT IS SO ORDERED.

MINZNER, C.J., and HARTZ, J., concur.