This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: May 11, 2026**

**No. S-1-SC-40306**

**STATE OF NEW MEXICO,**

> Plaintiff-Appellee,

v.

**TIMOTHY MARC LOPEZ,**

> Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF RIO ARRIBA COUNTY**
**Mary Marlowe Sommer, District Judge**

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Santa Fe, NM
Eric J. Orona, Assistant Solicitor General
Albuquerque, NM

for Appellee

## DECISION

**BACON, Justice.**

**{1}**     Defendant Timothy Lopez was convicted of first-degree murder (willful and deliberate) for shooting and killing Derek Velarde (Victim), contrary to NMSA 1978, Section 30-2-1(A)(1) (1994). On appeal to this Court pursuant to Rule 12-102(A)(1) NMRA (capital appeal), Defendant claims the lack of a voluntary manslaughter instruction was error or, alternatively, constituted ineffective assistance of counsel; the

trial court abused its discretion in allowing an improper rebuttal witness; and that sufficient evidence did not support his conviction. We exercise our discretion under Rule 12-405(B) NMRA to affirm Defendant's conviction by nonprecedential decision.

## I.       BACKGROUND

**{2}**     Defendant killed Victim on Thanksgiving Day, November 26, 2020, at the La Tiendita gas station in Alcalde, New Mexico.

**{3}**     As context, evidence presented at trial included Defendant's report to police in August of that year that his girlfriend, Lynsey Horcacitas, had been raped. Horcacitas underwent a sexual assault nurse examiner exam, and the alleged rape case was turned over to investigators. Victim, who was one of Defendant's friends and employees at Defendant's small winery business, was the target of the investigation.

**{4}**     Audio evidence from that investigation included Defendant's statements to investigators that he "seriously thought about blowing [Victim's] head off"; "[planned to] lure [Victim] in, bring him back to work, and shoot him at my house"; and "[had I known Victim was raping Horcacitas], I would have beaten him to death with my bare hands." Defendant also told his neighbor, "I dug a bunker and I have a straight shot to [Victim's] house. I'm going to kill him." Defendant also had yard signs on and near his property saying Victim raped Horcacitas. After investigating the alleged rape, police concluded that, based on Horcacitas's inconsistent statements and video footage of her and Victim having what appeared to be consensual sex, there was not "any evidence to suggest [Horcacitas] was raped."

**{5}**     On the day of the homicide, Victim filled his vehicle with gas at La Tiendita, joined by a passenger, Jimmy Campbell. Defendant soon arrived at the gas station. Video surveillance shows Defendant approached the driver's-side door of Victim's truck while Victim was sitting in the driver's seat. Defendant then appears to strike the window twice in a downward direction with an object in his hand. Campbell exited the truck and entered the gas station. Moments later Defendant shot through the driver's-side window, which physical evidence supported was rolled most of the way up, and the bullet struck Victim in the head. Defendant then opened and closed the car door quickly before entering the gas station. He partially disassembled his gun and placed it conspicuously outside the gas station. Victim died of the gunshot wound to the head.

**{6}**     Police interviewed Defendant after the incident. During the interview, Defendant admitted he was involved in the shooting, but claimed the shooting was accidental during the course of self-defense. Specifically, Defendant claimed "[Victim] was trying to stab me"; "he grabbed my gun as he put the knife through the window, and it barely missed me"; "he grabbed my arm right here . . . had me like this and it fired"; "I didn't fire that gun, well I did technically, but [if he hadn't] grabbed my hand against the secondary safety, it wouldn't have gone off." Defendant also suggested he was still angry at Victim for raping Horcacitas, stating, "[the goal was to] throw Victim in prison forever so that he could get raped" and "I wanted him to suffer." Defendant claimed to New Mexico State

Police Sergeant Alexander Bennett he had defensive wounds, but Sergeant Bennett testified that he did not see any such injuries.

**{7}** At trial, following the State's case-in-chief, Defendant moved for a directed verdict, arguing the evidence was not sufficient to support the first-degree murder charge and the case should not proceed further. Alternatively, Defendant argued he should only be charged with second-degree murder or, because he was sufficiently provoked by Victim waving a knife, voluntary manslaughter. The district court denied Defendant's motion and proceeded to hold a jury instruction conference.

**{8}** During that conference, the district court granted Defendant's request for a self-defense jury instruction and presumed, based on Defendant presenting the alleged rape as evidence of "provocation," that Defendant also wanted a voluntary manslaughter instruction. The State urged the district court not to instruct on self-defense because the evidence suggested Defendant was the first aggressor. After further discussion, the district court eventually agreed with the State and rescinded Defendant's self-defense instruction.[1] Defendant then withdrew the voluntary manslaughter instruction, apparently believing the district court denied his self-defense instruction because of potential confusion related to the issue of provocation in the voluntary manslaughter instruction.

**{9}** In an effort to regain his self-defense instruction, Defendant presented a case-in-chief during which he testified. Defendant's testimony abided with his consistent theory of the case that the killing was accidental, including his testimony that his gun fired when Victim "yanked" his arm during their struggle.

**{10}** After resting his case, Defendant renewed his request for a self-defense instruction. The district court granted the instruction, reasoning there was sufficient evidence to warrant it. Defendant never renewed his request for a voluntary manslaughter instruction, nor did the district court issue one sua sponte.

**{11}** In response to Defendant's case-in-chief, the State compelled the presence of Campbell, who was not on the State's witness list because he had previously declined to participate, for rebuttal. The district court permitted the State to call Campbell, and Defendant interviewed Campbell before he testified. Campbell testified that, to his knowledge, Victim did not own a gun; that he himself does not own a gun; that to his knowledge, Victim did not have a knife the day of the incident; that the only gun he saw the day of the incident was the one Defendant pointed at him and Victim; and that when Defendant walked up to Victim, Defendant said, "I'm going to kill you. You raped my wife."

---

1To support its denial of the self-defense instruction, the district court ultimately relied on the following proposition in *State v. Chavez*, 1983-NMSC-037, ¶ 6, 99 N.M. 609, 661 P.2d 887: "The rule is well established in this jurisdiction that a defendant who provokes an encounter, as a result of which he finds it necessary to use deadly force to defend himself, is guilty of an unlawful homicide and cannot avail himself of the claim that he was acting in self-defense." We note this general pronouncement in *Chavez* did not remove first-aggressor determinations from the province of the jury where a relevant evidentiary issue remains. *See* UJI 14-5191 NMRA (Self-defense; limitations; aggressor).

**{12}** Ultimately, the jury was instructed on first- and second-degree murder and self-defense. Defendant was convicted of first-degree murder and subsequently appealed.

## II.  DISCUSSION

**{13}** Defendant raises four issues before the Court, which we address in turn below. First, he argues that, because the district court instructed the jury on self-defense, the trial court's failure to instruct on voluntary manslaughter constitutes reversible error or, if the issue was unpreserved, fundamental error. Second, he argues ineffective assistance of counsel in the alternative, based on his counsel withdrawing his request for a voluntary manslaughter jury instruction and not subsequently re-requesting that instruction. Third, he argues the district court abused its discretion by allowing the State to call Campbell as a rebuttal witness. Fourth, he argues insufficient evidence supported Defendant's conviction for deliberate-intent first-degree murder.

### A.  Under Defendant's Theory of the Case, the Absence of a Voluntary Manslaughter Instruction Was Not Error

**{14}** "The propriety of jury instructions given or denied is a mixed question of law and fact which we review de novo." *State v. Taylor*, 2024-NMSC-011, ¶ 10, 548 P.3d 82 (internal quotation marks and citation omitted). "When evidence at trial supports the giving of an instruction on a defendant's theory of the case, failure to so instruct is reversible error." *State v. Henley*, 2010-NMSC-039, ¶ 25, 148 N.M. 359, 237 P.3d 103, *overruled on other grounds by State v. Ward*, ___-NMSC-___, ¶ 45, ___P.3d___ (S-1-SC-40503, Mar. 16, 2026).

**{15}** Regarding preservation of the issue, Defendant argues and the record reflects that the trial court during the initial jury instruction conference understood he requested a voluntary manslaughter instruction. On this basis, Defendant asserts this issue was preserved for appellate review, notwithstanding his subsequent withdrawal of that request. Citing *State v. Zamarripa*, 2009-NMSC-001, 145 N.M. 402, 199 P.3d 846, Defendant suggests the trial court's improper statement of the law—indicating that Defendant had to request *either* a self-defense instruction *or* a voluntary manslaughter instruction—resulted in defense counsel selecting the former in the best interests of Defendant without a legitimate waiver of the latter. *See id.* ¶ 50 ("There is no waiver where a defense attorney, his or her original objection rejected by the court, determines to 'make the best of a bad situation' and argues the improperly admitted evidence in the client's favor." (citation omitted)). Thus, Defendant argues we should review for reversible error rather than fundamental error, though he argues for reversal under either standard.

**{16}** Under the standards for both reversible error and fundamental error, our initial determination is whether error occurred: "We must determine whether a reasonable juror would have been confused or misdirected by the jury instruction." *State v. Barber*, 2004-NMSC-019, ¶ 19, 135 N.M. 621, 92 P.3d 633 ("Fundamental-error analysis then requires a higher level of scrutiny . . . to determine whether the [d]efendant's conviction was the result of a plain miscarriage of justice." (internal quotation marks and citation

omitted)). For the reasons that follow, we conclude the absence of a voluntary manslaughter instruction in this case was not error, and so we need not determine whether the issue was preserved: in the absence of error, Defendant's claim fails under either standard.

**{17}**    On the merits, Defendant argues under the premise that self-defense and voluntary manslaughter instructions were both necessary to present his theory of defense to the jury. Pointing to the district court's grant of the self-defense instruction, Defendant asserts that as a consequence "the court was also required to instruct on voluntary manslaughter." The Defendant then reinforces his proposition by quoting *State v. Abeyta*: "[W]here sufficient evidence is presented to support a finding that a defendant acted in self-defense, a defendant is entitled to have the jury receive an instruction on voluntary manslaughter based on imperfect self-defense." 1995-NMSC-051, ¶ 47, 120 N.M. 233, 901 P.2d 164, *abrogated on other grounds by State v. Campos*, 1996-NMSC-043, ¶ 32 n.4, 122 N.M. 148, 921 P.2d 1266. Defendant further argues under *State v. Reynolds*, 1982-NMSC-091, ¶¶ 11-12, 98 N.M. 527, 650 P.2d 811, that the jury's guilty verdict as to first-degree willful and deliberate murder "does not mean [the jury] might not have reached voluntary manslaughter if correctly instructed." *See id.* ¶ 11 (holding denial of a voluntary manslaughter instruction was error, the court rejected the argument "that a finding by the jury that the defendant acted with deliberate intention precludes any possibility that they could have found sufficient provocation").

**{18}**    Critically, however, Defendant's arguments ignore that his theory of defense throughout trial was predicated on the killing being *accidental* rather than *intentional*. As discussed further below, because his consistent theory was accident, Defendant was not entitled to a jury instruction justifying or mitigating an intentional homicide—including the self-defense instruction he received. Because the self-defense instruction was unwarranted, it cannot entitle Defendant to a voluntary manslaughter instruction under the reasoning in *Abeyta*.

**{19}**    In *State v. Lucero*, 2010-NMSC-011, 147 N.M. 747, 228 P.3d 1167, we relevantly explained the distinction between accidental killings, which may be *excused*, and intentional killings, which may be *justified*. *See id.* ¶ 14 ("A killing in self-defense is intentional in nature, but justified by the imminent threat to the defendant's life or limb, whereas an accidental killing is unintentional and non-negligent in nature."). In *Lucero*, we upheld the trial court's denial of a self-defense instruction where the defendant relied on an accidental shooting theory and "failed to produce any evidence indicating that he fired the pistol intentionally." *Id.* ¶ 15. The *Lucero* defendant testified, "[After being punched in the face], I stumbled just like out of a reaction, I put my hands up and the gun was still in my hand at that time, and I shot off one round. . . . [i]t was just the reflex of getting hit, you put your hands up. I pulled my hand out of my pocket and fired." *Id.* ¶ 6. Under the defendant's accident theory, he was not entitled to a self-defense instruction which would justify an intentional killing. *Id.* ¶ 15.

**{20}**    We clarified in *Lucero* that "the fundamental distinction between [intentional killings such as] self-defense and accident[al killings] is the defendant's mental state":

A killing in self-defense is *justifiable* because an otherwise criminal action becomes permissible under the circumstances. Self-defense is thus a complete defense; if established, a defendant is not guilty of the crime. By contrast, an accidental killing is *excusable* because it is an unintended homicide which occurs in the course of performing a lawful act, without criminal negligence. As in other cases of excusable homicide, the slayer is not criminally responsible therefor, as *an act that is committed accidentally does not involve a mental state cognizable to the criminal offenses of murder and involuntary manslaughter*.

*Id.* ¶¶ 13-14 (third emphasis added) (internal quotation marks and citation omitted). We further recognized that our uniform jury instructions reflect this distinction in mental states: under UJI 14-5171 NMRA a killing is in self-defense if "[t]he defendant *was in fact put in fear* by the apparent danger of immediate death or great bodily harm and killed [the victim] *because of that fear*," whereas under UJI 14-5140 NMRA (excusable homicide) a killing is accidental if it is committed "with usual and ordinary caution and *without any unlawful intent*." (Emphasis added.)

**{21}**    For the defendant in *Lucero* to receive a self-defense instruction, therefore, he "was required to produce evidence supporting a reasonable inference that he *intentionally and purposefully* fired his pistol out of fear of immediate death or great bodily harm." 2010-NMSC-011, ¶ 15 (emphasis added). However, the defendant there produced no such evidence of intentionality, instead testifying that his "pistol discharged *accidentally or reflexively* as a result of the physical assault initiated by [the] [v]ictim." *Id.* (emphasis added). Under the defendant's accident theory and his testimony that he *unintentionally* used deadly force, he "was not entitled to a jury instruction regarding the *intentional* use of force in self-defense." *Id.* ¶¶ 20-21 (emphasis added).

**{22}**    The reasoning in *Lucero* controls here. Relying on his accident theory, Defendant produced no evidence demonstrating that the killing was intentional, and therefore he was not entitled to a jury instruction predicated on the killing being an intentional act. Accordingly, an instruction was not warranted pursuant to either self-defense or voluntary manslaughter, both of which theories are premised on excusing or mitigating intentional acts. *See Henley*, 2010-NMSC-039, ¶ 20 ("Self-defense, unlike accident, is an intentional act."); *see also* UJI 14-220 NMRA (providing the elements of voluntary manslaughter as including that "[t]he defendant knew that their acts created a strong probability of death or great bodily harm"). Instead, Defendant's accident theory presented the jury with a basis, if believed, to find him not guilty of homicide due to lacking the requisite mens rea. *See Lucero*, 2010-NMSC-011, ¶ 14 (noting, under the committee commentary for UJI 14-5140, that "juries are not given an instruction on the defense of accident because, in the absence of criminal negligence, the defendant cannot be found guilty of involuntary manslaughter").

**{23}**    "[J]uror confusion or misdirection may stem . . . from instructions which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law." *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. Under the foregoing, the absence of a voluntary manslaughter instruction did not result

in an inaccurate rendition of the law relevant to Defendant's theory of defense, and Defendant's claim for reversal does not avail.

## B. Defendant Does Not Show Withdrawal of the Request for a Voluntary Manslaughter Instruction Constituted Ineffective Assistance of Counsel

**{24}** In order to establish a successful claim of ineffective assistance of counsel, a defendant must show error by counsel and then prejudice resulting from that error. *State v. Smith*, 2016-NMSC-007, ¶ 62, 367 P.3d 420. "A prima facie case of ineffective assistance of counsel is made on appeal where: (1) it appears from the record that counsel acted unreasonably; (2) the appellate court cannot think of a plausible, rational strategy or tactic to explain counsel's conduct; and (3) the actions of counsel are prejudicial." *Id.* (internal quotation marks and citation omitted).

**{25}** Defendant's argument for ineffective assistance of counsel relies on the false premise that his testimony warranted jury instructions for both self-defense and provocation claims. Under that premise, Defendant asserts that, "once [Defendant] testified and a self-defense instruction was granted, trial counsel acted unreasonably by failing to re-request a voluntary manslaughter instruction." As to prejudice, Defendant makes only a general argument under the same false premise that "[h]ad the jury been instructed to determine whether [Defendant] acted with sufficient provocation, it is likely the trial could have resulted in a conviction for manslaughter instead of murder."

**{26}** Under our previous analysis, Defendant's claims of error and prejudice fail, as they are predicated on a legal theory we have rejected—that Defendant was entitled to a voluntary manslaughter instruction. As the State cites, the evidence necessary for a claim of ineffective assistance of counsel "is not usually sufficiently developed in the original trial record," and therefore such a claim "should normally be addressed in a post-conviction habeas corpus proceeding, which may call for a new evidentiary hearing to develop facts beyond the record." *State v. Crocco*, 2014-NMSC-016, ¶ 13, 327 P.3d 1068. In this case, however, further development of the factual record cannot substantiate Defendant's ineffective assistance of counsel theory as currently constructed. Consequently, we hold trial counsel's failure to re-request a voluntary manslaughter instruction was not error and Defendant by that failure was not deprived of the right to competent counsel.

## C. The District Court Did Not Abuse Its Discretion in Allowing Campbell to Testify as a Rebuttal Witness

**{27}** Next, Defendant argues the trial court abused its discretion by allowing the State to call Campbell as a rebuttal witness. Defendant argues the court's ruling violates our standards regarding late disclosure of evidence, as "the defense was not able to interview [Campbell] until minutes before he testified." Defendant also argues Campbell was not a proper rebuttal witness because his testimony responded only to evidence already presented in the State's case-in-chief.

**{28}** Defendant preserved the issue in the district court by objecting to the rebuttal witness and citing proper authority. Because the issue was preserved, this Court reviews the district court's decision with regard to discovery, including the remedy, for an abuse of discretion. *State v. Desnoyers*, 2002-NMSC-031, ¶ 25, 132 N.M. 756, 55 P.3d 968, *abrogated on other grounds by State v. Forbes*, 2005-NMSC-027, ¶ 6, 138 N.M. 264, 119 P.3d 144; *State v. Wilson*, 2001-NMCA-032, ¶ 39, 130 N.M. 319, 24 P.3d 351 ("[R]emedies for violation of discovery rules or orders are discretionary with the trial court."), *abrogated on other grounds as recognized by State v. Montoya*, 2005-NMCA-078, 137 N.M. 713, 114 P.3d 393; *State v. Simonson*, 1983-NMSC-075, ¶ 32, 100 N.M. 297, 669 P.2d 1092 ("The admissibility of rebuttal evidence is within the discretion of the trial court and will not be disturbed absent an abuse of discretion."). In order to find an abuse of discretion, we must conclude that the decision below was against logic and not justified by reason. *State v. Brown*, 1998-NMSC-037, ¶ 32, 126 N.M. 338, 969 P.2d 313.

**{29}** When evidence is disclosed for the first time during trial, our jurisprudence uses a four-factor test to determine whether an abuse of discretion occurred to warrant reversal. *State v. Mora*, 1997-NMSC-060, ¶ 43, 124 N.M. 346, 950 P.2d 789, *abrogated on other grounds by State v. Frazier*, 2007-NMSC-032, ¶ 31, 142 N.M. 120, 164 P.3d 1. The reviewing court will consider the following factors (*Mora* factors): "(1) whether the [s]tate breached some duty or intentionally deprived the defendant of evidence; (2) whether the improperly non-disclosed evidence was material; (3) whether the non-disclosure of the evidence prejudiced the defendant; and (4) whether the trial court cured the failure to timely disclose the evidence." *Id.*

**{30}** For the first *Mora* factor, Defendant argues the State violated its discovery obligations under Rule 5-501(A)(5) NMRA, which relevantly requires the State to "make available to the defendant . . . a written list of the names and addresses of all witnesses which the prosecutor intends to call at the trial." Defendant concedes Campbell was initially included on the State's witness list but points to the State's subsequent nolle prosequi of the count of aggravated assault in which Campbell was the victim, due to Campbell declining to participate. Defendant asserts he reasonably relied on the nolle prosequi as an "assurance[] that [Campbell] would not testify" and alleges without further support that the State later calling Campbell "as a rebuttal witness was an attempt to skirt the disclosure rules." Defendant does not contest the State's explanation that, only after Defendant's testimony, law enforcement "then promptly located and arrested [Campbell] to contradict Defendant's version of events."

**{31}** Under his concession above, Defendant does not demonstrate that "the [s]tate breached some duty or intentionally deprived the defendant of evidence." *Mora*, 1997-NMSC-060, ¶ 43. The State relevantly satisfied its initial duty by including Campbell on its witness list. As to intentional deprivation of evidence, Defendant implies such bad faith in characterizing the State's action as "an attempt to skirt the disclosure rules"; however, Defendant offers no record evidence or explanation to support this allegation against the State. To the contrary, Defendant elsewhere places blame on the *district court* for these circumstances, alleging the court's initial denial of a self-defense instruction was erroneous and improperly required Defendant to testify, which in turn

"opened the door for the State to improperly call [Campbell] in rebuttal." Though not necessary to the analysis of this *Mora* factor, we have established above that Defendant was not entitled to a self-defense instruction; thus, the underlying circumstance to which Defendant objects here was not error. In sum, Defendant does not carry his burden to show the first *Mora* factor weighs against the State.

**{32}** For the second *Mora* factor, regarding materiality, Defendant's brief-in-chief merely asserts without explanation that Campbell's "testimony was crucial to the State's case." Contradicting this assertion, however, Defendant's reply brief states that "[n]one of this was new," referring to Campbell's testimony rebutting Defendant's testimony. Defendant seems to argue the substance of Campbell's testimony *had been* material during the State's case-in-chief to counter Defendant's version of events stated to police, but that Campbell's testimony had no *additional* relevance to support its inclusion at the rebuttal stage. Taken together, Defendant's arguments do not offer a clear position as to the materiality of Campbell's testimony. The State answers that Campbell's testimony only became material when Defendant testified, implying this *Mora* factor should not weigh against the State.

**{33}** Our test for materiality is whether "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.'" *Desnoyers*, 2002-NMSC-031, ¶ 28 (quoting *State v. Chavez*, 1993-NMCA-102, ¶ 20, 116 N.M. 807, 867 P.2d 1189). Importantly, Defendant presents no substantive argument that the result of his trial would have been different had he known further in advance that Campbell would testify on rebuttal. Thus, Defendant does not show this factor should weigh against the State.

**{34}** For the third *Mora* factor, regarding prejudice, Defendant claims he was prejudiced because he "reasonably understood" that Campbell was not going to testify, and "[t]he last-second addition of [Campbell] as an improper rebuttal witness . . . affected [Defendant's] trial strategy regarding having [Defendant] testify." The State responds that Defendant's trial strategy could not have been influenced by reliance on Campbell not testifying because Defendant knew Campbell was a potential witness.

**{35}** While neither party's argument is convincing, the burden is on Defendant to show prejudice. Because Defendant does not explain how his trial strategy was affected in a manner that hurt his cause, his argument here is unavailing.

**{36}** For the fourth *Mora* factor, the trial court took measures to cure the late disclosure of Campbell by permitting Defendant to interview him before his testimony and by permitting surrebuttal testimony by Defendant. Defendant claims the interview was insufficient to cure any potential prejudice but does not explain why, asserting only that the court's measures "[did] nothing to cure the impact on [Defendant's] right to remain silent or contradiction of his defense by [Campbell]." The State argues the interview and surrebuttal testimony were sufficient.

**{37}** Defendant's undeveloped position does not avail: Defendant elected to forgo his right to remain silent *before* Campbell testified, thus that decision was not affected by the rebuttal testimony, and contradiction of a defendant's defense is an ordinary purpose of rebuttal testimony generally. Absent a developed argument by Defendant regarding why the interview and surrebuttal were insufficient, we conclude the timing of Campbell's late disclosure was adequately cured.

**{38}** In sum, the *Mora* factors do not weigh in support of Defendant's claim. Because Defendant does not show the trial court's decision to allow Campbell to testify in rebuttal was against logic and not justified by reason, we hold no abuse of discretion occurred.

## D.   Defendant's Conviction Was Supported by Sufficient Evidence

**{39}** Finally, Defendant argues insufficient evidence supports his conviction regarding two of the elements of first-degree murder: that he did not act in self-defense and that he killed Victim with deliberate intention.

**{40}** In reviewing whether sufficient evidence supports a conviction, we consider "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314. Our task is to determine whether, on careful scrutiny of the record, "*any* rational jury could have found each element of the crime to be established beyond a reasonable doubt." *State v. Garcia*, 1992-NMSC-048, ¶ 27, 114 N.M. 269, 837 P.2d 862. When reviewing the record, we view the evidence in the light most favorable to the jury's verdict, remaining cognizant that "the jury is free to reject [the d]efendant's version of the facts." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515. This Court will "not invade the jury's province as fact-finder by second-guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting its judgment for that of the jury." *State v. Garcia*, 2016-NMSC-034, ¶ 15, 384 P.3d 1076 (text only)[2] (citation omitted).

**{41}** As the enumerated evidence below demonstrates, sufficient evidence supported the conviction as to both challenged elements.

**{42}** First, the following evidence supported the conclusion that Defendant did not act in self-defense:

   1)   Defendant approached Victim at the gas station;

   2)   Defendant had his gun drawn when he approached Victim;

   3)   Neither Victim nor Campbell had a gun;

---

[2]"(Text only)" indicates the omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

4) After approaching Victim, Defendant told Victim, "I'm going to kill you. You raped my wife."

5) Victim's driver's-side window was rolled most of the way up;

6) Defendant struck Victim's driver's-side window twice;

7) Defendant shot through the driver's-side window;

8) Defendant had no injuries.

**{43}** Second, the following evidence supported the conclusion that Defendant acted with deliberate intent:

1) Prior to the killing, Defendant made multiple statements to police saying he wanted to kill Victim or planned to kill Victim;

2) Defendant had motives to kill Victim because Defendant thought Victim raped Horcacitas and because Defendant thought Victim had been shooting at his house;

3) Defendant dug a bunker and told his neighbor he planned on shooting Victim from the bunker;

4) Defendant approached Victim's vehicle with a gun in his hand;

5) After approaching Victim's truck, Defendant told Victim, "I'm going to kill you. You raped my wife."

**{44}** Given this wealth of evidence, a reasonable juror could have concluded Defendant acted with deliberate intent and did not act in self-defense.

**{45}** Regarding the element that he did not act in self-defense, Defendant relies on his own testimony providing contrary evidence. However, because "the jury is free to reject [the d]efendant's version of the facts," his contrary testimony does not demonstrate the relevant evidence above was insufficient. *State v. Duran*, 2006-NMSC-035, ¶ 5.

**{46}** Regarding the element of deliberate intent, Defendant likens his case to *Garcia*, 1992-NMSC-048. In that case, this Court held sufficient evidence did not support a first-degree murder conviction when "[t]here was *no* evidence to support the jury's conclusion that . . . Garcia decided to stab [his victim] as a result of careful thought; that he weighed the considerations for and against his proposed course of action; and that he weighed and considered the question of killing and his reasons for and against this choice." *Id.* ¶ 28. The *Garcia* Court went on to explain that the "*only* evidence before the jury, direct or circumstantial, as to [the defendant's] state of mind before the killing was that he quarreled with [his victim], and then appeared to make up, in the back yard; that he then quarreled again in the front yard, trading punches with and shoving [his victim]

against a wall; and that he then cut his victim in the face and stabbed him in the chest." *Id.*

**{47}** Defendant's comparison of his case to *Garcia* is refuted by the abundance of direct evidence revealing Defendant weighed the considerations for and against killing Victim in the months leading up to the incident. This evidence was composed of his statements to police explaining that he thought about killing Victim, and also the fact that he told his neighbor about his "bunker" from which he planned on killing Victim. True, the killing happened quickly, but the jury could have reasonably inferred it was not a *Garcia*-type action lacking evidence of deliberation, but rather the culmination of one saga in which Defendant contemplated killing and took advantage of an opportunity to do it.

**{48}** Under the foregoing, we hold Defendant's conviction for first-degree murder was supported by sufficient evidence.

## III. CONCLUSION

**{49}** We affirm.

**{50}** **IT IS SO ORDERED.**

**C. SHANNON BACON, Justice**

**WE CONCUR:**

**JULIE J. VARGAS, Chief Justice**

**MICHAEL E. VIGIL, Justice**

**DAVID K. THOMSON, Justice**

**BRIANA H. ZAMORA, Justice**